**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| In re: | : | |
| | : | Chapter 11 |
| DELAWARE VALLEY LIFT TRUCK, INC., | : | |
| | : | Bankruptcy No. 20-14408 (AMC) |
| *Debtor.* | : | |
| | : | **Hrg. Date: March 3, 2021** |
| | : | **900 Market Street, Courtroom #4** |
| | : | **Philadelphia, PA 19107** |

**RESPONSE OF PAUL J. WINTERHALTER, ESQUIRE**
**AND OFFIT KURMAN, P.A.  IN OPPOSITION TO THE IMPOSITION OF**
**SANCTIONS SOUGHT BY JAMES E. MEYER AND OFFICE OF THE U.S. TRUSTEE**

Paul J. Winterhalter, Esquire ("Winterhalter") and Offit Kurman, P.A. ("Firm") (referred

to in the aggregate as "Counsel") hereby respond in opposition to: (i) the motion filed by and on

behalf of James E. Meyer ("Jim") seeking the imposition of sanctions pursuant to  11 U.S.C.

§105(a),  28 U.S.C. § 1927, the court's inherent powers and/or under Federal Bankruptcy Rule

9011 [ECF No. 107]; and (ii) the United States Trustee's Motion for Sanctions Pursuant to Fed.

R. Bankr. P. 9011 and 11 U.S.C. §105(a) [ECF No. 105] (together, the "Motions") relating to the

actions by Counsel during the representation of Delaware Valley Lift Truck, Inc. ("DVLT"), the

former Debtor-in-Possession.

The existence of the Motions is regrettable and a serious concern of Winterhalter and the

Firm. The Office of the U.S. Trustee ("UST") and Jim perceived intentional wrongdoing by

Counsel.  Counsel took an aggressive, but legally supportable, position on behalf of DVLT in a

difficult case to advance DVLT's goal of liquidating its assets, in a fair and open forum for the

maximum benefit of the creditors and the owners, after DVLT received an offer to purchase a

significant portion of its assets.  Counsel expected the Court would agree that the facts of this case

supporting a bankruptcy filing outweighed any potential concerns that the case was in the nature

1

of a two-party dispute in bankruptcy ("Two-Party Dispute)[1]. The Court found several factors supporting dismissal as a Two-Party Dispute.  Nevertheless, the reasons and documentation identified below supported the filing from Counsel's perspective. The evidence viewed in its totality support the actions by Counsel as being in good faith and does not warrant any sanctions.

The U.S. Trustee and Jim (and seemingly the Court in its dismissal of the case) placed the greatest weight of their argument for sanctions on the Court's perception that John W. Meyer ("Jack"), Jim's brother and a Director and the other 50% shareholder of DVLT, unfairly took advantage of Jim by filing this case and manufactured a meeting to support the bankruptcy filing. Counsel identifies below the factual and legal support for the filing and thereby demonstrates that grounds do not exist for imposing a sanction under 11 U.S.C. §105, the inherent powers of the Court, Rule 9011 or 28 U.S.C. § 1927.   Furthermore, Counsel hope to remove any tarnish associated with Counsel as a result of this proceeding.

## BACKGROUND

### A
### DVLT

DVLT had been a client of the Firm in corporate matters prior to 2020.  The Firm also provided certain estate planning legal services to John W. Meyer ("Jack"). Counsel disclosed these connections with DVLT and Jack as required by the Bankruptcy Code. [ECF No. 31-1].

In March 2018, Jim, a Director and 50% shareholder in DVLT, initiated litigation in the United States District Court for the Eastern District of Pennsylvania, Case No. 18-1118 ("District

---

[1] Bankruptcy courts disfavor a filing that is in the nature of a Two-Party Dispute for such reasons as the filing was a mere litigation tactic, forum shopping, the issues in dispute exist under state law and there was no purpose for a reorganization or a liquidation. *In re DCNC North Carolina I, LLC*, 407 B.R. 651, 2009 LEXIS 1899 (E.D. Pa. 2009 J. Frank); *see also*, *In re S. Canaan Cellular Invs., Inc.*, No. 09-10473, 2009 Bankr. LEXIS 2967, at *20 (Bankr. E.D. Pa. May 19, 2009);  *In re Mazzocone*, 183 B.R. 402, 418 (Bankr. E.D. Pa. 1995)(court declined to dismiss bankruptcy proceeding and rather suspended it as case proceeded in other forum).

Court Litigation"), against DVLT and Jack, his brother, who is a Director and the other 50%

shareholder of DVLT, and others including Barbara Meyer, the wife of Jack. Neither Winterhalter

nor the Firm did not serve as counsel in the District Court Litigation. Bernheim assumed the

representation of the Defendants from prior DVLT counsel.

In the District Court Litigation, Jim is trying to liquidate the value of his ownership interest

in DVLT through a dissolution and/or monetary award. In response, Jack investigated whether a

corporate sale of DVLT was a desirable alternative to liquidating the business through a receiver.

In the Spring of 2020, Best Line Equipment ("Best Line"), an entity in a neighboring

market, expressed interest to Jack in acquiring DVLT to expand its business operations into the

Philadelphia/Delaware Valley. At this juncture, Winterhalter, an attorney experienced in

bankruptcy at the Firm, analyzed whether liquidating the business through bankruptcy was viable

and desirable.

In late June of 2020, Winterhalter met with Jack and shortly thereafter participated in a

conference call with Jack and Adam Houseknecht, the President of Best Line. Jack openly

disclosed the Meyer family litigation. The principals of Best Line expressed a strong desire not to

be drawn into litigation or have any type of residual exposure as a result of any transaction.

Discussions ensued over effectuating the sale through a chapter 11 bankruptcy.

A chapter 11 bankruptcy was an appropriate means for effectuating the sale to Best Line.

Bankruptcy process would provide an open, clear and transparent procedure for effectuating the

sale of the business to Best Line and provide an opportunity for an increased sales price. The

process would provide full disclosure as to the specific terms of the sale proposal and notice of the

transaction would be provided to all interested persons, including Jim. The proposed transaction

would be subject to higher and better offers through a competitive bidding process in which any

3

party who had the financial capacity, including Jim, would have the free and fair opportunity to

bid more for the same assets than the amount Best Line proposed to pay. If a competitive bid was

presented by Jim, or any other party, the Court could conduct an auction for purposes of

establishing the highest and best offer.

In July 2020, DVLT executed an engagement letter with Counsel for the purposes of

instituting the bankruptcy case, if necessary, to advance the sale. Counsel for DVLT and Best

Line worked on a draft Asset Purchase Agreement ("APA") over a number of weeks. Best Line

insisted that DVLT promptly file bankruptcy and expedite a sales process. DVLT was concerned

that interested parties may have justifiable concerns if the sale to Best Line was immediately

proposed instead of pursuing procedures to seek competing offers.

DVLT personnel and its outside accountant assembled information for the bankruptcy

schedules. DVLT had difficulty identifying a fair market value for its assets and decided to list

the value of all assets of the Company at their respective acquisition cost, without consideration

of depreciation taken to date. DVLT holds various machinery and equipment subject to financing.

DVLT concluded that Jim would contest the value of assets, as he did in the District Court

Litigation, no matter what values DVLT identified. DVLT used the acquisition cost of the assets.

While not the most accurate method, but it was the least contentious. Furthermore, believing

DVLT was solvent, the bid procedures would establish the fair value of DVLT's assets.

B
Special Meetings

Counsel reviewed various corporate documents of DVLT prior to filing including, the

Articles of Incorporation, the Bylaws and the Shareholders' Agreement (specifically paragraph

26(c) providing that in the event of an impasse among the shareholders on any major decision,

John, the father of Jack and Jim, would resolve the dispute.

4

On Monday, October 26, 2020, Winterhalter forwarded a Notice of Special Meeting of Shareholders and a Notice of Special Meeting of Directors (together, "Directors and Shareholders Notices") signed by Jack as the President of DVLT to the Shareholders, the Directors and their respective legal counsel together with a copy of the APA so each person had adequate information to make an informed vote on the APA and, if necessary, filing bankruptcy. The Directors and Shareholders Notices scheduling the meetings for November 6, 2020 at 10 and 10:30 a.m., respectively and specifically stated in the Subject Line of the transmittal e-mail, "*Notices of Special Meeting of Directors & Shareholders- Approval of Sale & Bankruptcy Filing.*" (Exhibit 1).

On Wednesday, October 28, 2020 at 5:27 p.m., Gary Green, Esq. ("Green"), counsel for Jim, acknowledged receipt of the Directors and Shareholders Notices and informed Winterhalter by e-mail that neither he nor Jim would be available for the meetings. In addition, Jim would need a significant amount of financial information that he desired, and he would have numerous questions about the offer to buy assets and what other offers had been undertaken to locate other purchasers. Exhibit 2. On Wednesday, October 28, 2020 at 6:17 pm, Winterhalter responded by e-mail to Green's e-mail, promising to "get the information you and your client need to see this is a decent opportunity and makes sense for everyone." Exhibit 3.

On Friday, October 30, 2020, Green sent Winterhalter and Jack by e-mail, a formal Demand for Inspection of DVLT financial records, which identified twelve (12) financial corporate documents for production pursuant to 15 Pa. C. S.A. §§1508(b) and 1512(a). ("Document Inspection Demand"). Exhibit 4. On Friday, October 30, 2020 at 11:58 a.m., in response to Green's Document Inspection Demand, Winterhalter sent an e-mail to Green attaching copies of the draft bankruptcy schedules as a partial response to the Document Inspection Demand and a schedule for a potential distributions to shareholders if the proposed sale was consummated.

5

Winterhalter stated he would do his best "to arrange for you to have as much of the information requested in your correspondence from earlier today delivered to you by Monday." Winterhalter closed by asking if "you and your client would feel more comfortable to participate in the meetings through a video-link as opposed to appearing in person." Exhibit 5. It should be noted that each of the e-mail communications between Winterhalter and Green included "*Notice of Special Meeting of Directors & Shareholders – Approval of Sale & Bankruptcy Filing*" in the Subject line.

On Tuesday, November 3, 2020 at 12:23 p.m., Larry Keller ("Keller"), an attorney with Sidkoff, Pincus & Green, P.C., sent an e-mail to Winterhalter, asking him to call him. Exhibit 6.

On Tuesday, November 3, 2020 at 12:50 p.m., Rachel Covington, a paralegal at Offit Kurman, sent an e-mail to Keller which included a link to access and download the documents in response to the Document Inspection Demand. Exhibit 7. On Tuesday, November 3, 2020 at 3:18 p.m. Keller e-mailed Winterhalter with the following request:

> *Paul:*
>
> *We are in receipt of the documents sent today. However, one of the documents we requested, the full 2020 General ledger for DVLT was not produced. Only selective portions of the 2020 General Ledger were produced.*
>
> *Please send us the full 2020 General ledger for DVLT.*

Exhibit 8. This communication also included "*Notice of Special Meeting of Directors & Shareholders - Approval of Sale & Bankruptcy Filing*" in the Subject line.

Winterhalter subsequently sent a notice to Green, Keller; Jim, John Mitchell, CPA, John, Jack and Bernheim, which listed the Subject Line as "*Delaware Valley Lift Truck, Inc. - Negotiations/Evaluation on Sale of Business-Global Settlement*" scheduled for Friday, November 6, 2020 at 11 a.m. through Microsoft Teams. Exhibit 9. Winterhalter acknowledges that the subject line omitted "Bankruptcy Filing," but understood that both the sale and the bankruptcy

filing would be topics of discussion as identified in the original Directors and Shareholders Notices and as indicated in the subject lines of the prior e-mails between counsel for the respective parties.

On November 6, 2020, Jim, his representatives, Jack, his counsel, John, DVLT, Bernheim and Counsel participated in the meeting via Microsoft Teams ("Teams"). Despite Jim's and his counsel's initial lack of availability, they became available.  There is a good faith dispute whether the meeting was a Special Meeting of the Directors, a Special Meeting of the Shareholders, as noticed, a settlement conference or a combination thereof.  Counsel had a good faith belief that the meeting of the principals of DVLT constituted a meeting of directors and shareholders: after the issuance of the Notices; all of them appearing on the meeting (Jack, John[2], John Mitchell and Winterhalter appeared via video; a discussion ensuing; determining whether each would vote to sell the assets of DVLT and, if not, file bankruptcy to accomplish the contemplated sale; and the execution of the signed Resolution after approval by a majority of the Directors.

During the hearing on the Motion to Dismiss, the Court became generally familiar with what transpired during the conference call on Friday, November 6, 2020 among Green, Keller, Jim, Green's financial consultant, Mr. Mitchell, Jack, John, Bernheim and Winterhalter.

The Teams participants in the scheduled conference call were Jim, Green, Keller, and John Mitchell, all on behalf of Jim, participated in the Teams call at approximately 11 a.m. through 12:07 p.m.  Jack, John, Bernheim and Winterhalter participated in such telephone call, but they were on for approximately 20 minutes longer from 11 a.m. through 12:27 p.m.[3]  See Exhibit 10.

---

[2] John was sitting with Jack and one or both appeared on video.  John's testimony seemed uncertain about who was at the meeting.  Most participants were not on video but on audio only.  John may not have absorbed all of the different names on the call.  Ex. 24, Transcript, p. 223, line 21 – 25; page 225, line 1 – 12.

[3] The time is shown in UTC (Coordinated Universal Time), which shows a time five (5) hours ahead of EST.

**This is the additional 20 minutes during which time Jack and John voted on the issues in the**

**Notice** (which the Motions state did not occur and which the Court speculated did not occur).

During the call, at 11:27 a.m., Bernheim e-mailed Winterhalter and stated the following:

*Paul:*

*I am not going to do a point-by-point rebuttal, but he is in error on a number of issues.  The replacement of Jim has proven to be very beneficial.*
*The $30K in the K-1 to Peggy had to deal with reimbursing for payment of Jim and Peggy's taxes.*
*Gary Green is terribly off base and insulting.*

*Dan*

Exhibit 11.

After 66 minutes from the commencement of their involvement, Jim, Green, Mr. Mitchell and Keller left the call. See Exhibit 10.  Winterhalter also hung up, but received an e-mail from Bernheim at 12:07 p.m., stating, "*Jack and I are still on the line.  The question is what next*?" Winterhalter immediately rejoined the call and a discussion ensued on next steps. A copy of the email confirming the continuance of the call. See Exhibit 12.  The conversation continued for approximately 20 minutes, with Jack, John, Bernheim and Winterhalter discussing Jim's clear refusal at the meeting to execute the APA and his opposition to the bankruptcy filing.  Exhibit 10.

Considering DVLT is a family owned business owned by the two brothers, and that John was the tie-breaking vote as a Director and on behalf of the shareholders under the Shareholders' Agreement, Winterhalter asked John what he wanted to do in light of the clear impasse.  John confirmed when asked that he: (1) supported DVLT entering into the APA; and (2) supported filing the bankruptcy to accomplish the sale. At that point, Winterhalter asked Jack, as a director, if he: (1) supported DVLT signing the APA; and (2) supported the filing bankruptcy.  Jack verbally confirmed that he was in agreement with signing the APA and filing bankruptcy.    This

confirmation also broke the deadlock among the shareholders of DVLT under the Shareholders'
Agreement.

Bernheim was on the telephone during this entire dialogue and was fully able to hear and
listen to Winterhalter's inquiries and Jack and John's affirmative responses to both questions.
Bernheim also participated in these discussions for approximately 20 minutes.

On Tuesday, November 10, 2020 at 11:47 a.m., Winterhalter forwarded an e-mail to Jack
and Bernheim attaching a draft of the proposed Corporate Resolution which described the impasse
with Jim and the other two (2) directors and authorized the signing of the APA and filing of the
Chapter 11 Bankruptcy case by the majority of the authorized directors.  Winterhalter asked Jack
and Bernheim to review the Resolution and provide any comments or modifications as necessary.
The full text of the e-mail reads:

> *Jack & Dan:*
>
> *Attached is a draft of the proposed Corporate Resolution I have prepared
> to authorize the Bankruptcy Filing and enter the Agreement of Sale with Best Line
> Leasing, Inc.  I fully expect that once this resolution is signed and the Bankruptcy
> is filed Gary Green will seek to challenge the legal authority for DVLT to have filed
> the Bankruptcy or enter the agreement.  I have reviewed the By Laws,
> Shareholders" Agreement and the Business Corporation Law of the
> Commonwealth of Pennsylvania and do not believe the [sic] Mr. Green's
> arguments would be successful in challenging the authority to proceed.*
>
> *Please review the proposed Resolution and let me know if you have any
> comments, or believe modifications are necessary.*

Exhibit 13 (Email dated November 10, 2020 and Resolution).  Neither Jack nor Bernheim
recommended any changes or corrections**.**

On Tuesday, November 10, 2020 at 2:46 p.m.  Bernheim responded to the draft resolution
by email stating that he supported DVLT filing bankruptcy, he did not recall if Jim was a Director

and expressed his concern that Counsel for Jim will complain on the basis that there was not sufficient corporate formality to the meeting.

> *Paul:*
>
> *No matter how this is orchestrated, Gary Green will complain in one form or another. Although it would have been perfunctory, he will argue not conducting a formal Shareholders meeting with an actual vote (which was done last time) is a violation of the Bylaws. Regardless if that argument has merit, it will be an additional argument.*
>
> *Also, I actually need clarity of a matter. I had been informed that Jim was no longer a Director that now seems to be in doubt. The removal of Jim pre-dated my involvement and I want to make sure we are consistent. If I need correct prior statements, I will do so.*
>
> *As a point of interest, I had to speak to Larry Keller of their office on another matter and he stated they thought we were to come back with another offer. I stated that Paul asked Gary on no less than 4 occasions if he would not accept the Best Line deal other than pursuant to his dictated terms. In response, again on no less than 4 occasions, Gary made clear his terms were non-negotiable.*
>
> *At this point, so that we do not lose the Best Line deal, it may be best to file the Bankruptcy and we will handle whatever is thrown in our direction.*
>
> *Dan*

Exhibit 14.

Winterhalter next communicated to Jim's counsel, Green at 4:11 p.m. on November 10, 2020, that Jim's proposal was not acceptable to DVLT. The email also advised that the remaining Directors approved the pursuit of the sale to Best Line and to file bankruptcy to accomplish the sale. Exhibit 15.

On Tuesday, November 10, 2020, at approximately 8:00 p.m., Winterhalter filed the petition. Shortly thereafter, Winterhalter emailed George Conway ("Conway"), trial attorney at the Office of the UST, and advised Conway of the filing and of the anticipated challenge to the filing by Jim, the 50% Shareholder of DVLT. Exhibit 16.

The following day, on November 11, 2020, Counsel to Best Line communicated to Winterhalter that Best Line sought to move forward and its concerns.   See Exhibit 17.

On November 12, 2020, Conway inquired of Winterhalter "Kindly enlighten me as to the bankruptcy purpose," to which Winterhalter immediately replied;

> George:
>
> *The purpose of the bankruptcy is two-fold.  First to effectuate the sale of the Company in an arm's length transaction subjecting the offer to potential competitive bidding to assure the sale gains the highest and best offer for the assets being sold.  Secondly, the Corporation is involved in a highly litigious litigation matter in the Federal District Court which is jeopardizing the value of the business and if left without protection would significantly bleed the business of substantial worth and near certainty collapse the entire operation.*

Exhibit 18.

On December 11, 2020, Winterhalter filed the Debtor's Identification of Remote Witnesses and Contact Information. [ECF No. 92].  The pleading states that Jack, John and Bernheim will testify.  With respect to Dan, the anticipated testimony is described as follows:

> *Summary of anticipated testimony*: If required to testify, Mr. Bernheim will testify as a fact witness relating to the scheduling, communications leading up to, **and the conduct of the November 6, 2020 meeting conducted among the parties relating to the efforts to obtain Board of Directors approval for the filing of the Bankruptcy.** Mr. Bernheim may also provide additional testimony, to the extent required based on testimony presented by the Movant during its case in chief.

The contemplated testimony included the efforts of the Board of Directors to approve the bankruptcy filing, which would include the approximate 1 ½ hour Teams meeting on November 6, 2020.  Between December 7, 2020 and December 12, 2020, Winterhalter and Bernheim spoke three (3) times about this case for approximately 1.30 hours. Winterhalter forwarded the Identification of Remote Witnesses to Bernheim on December 11, 2020.     Bernheim and Winterhalter also discussed who should testify about the November 6, 2020 meeting.  Bernheim

volunteered to do so since Winterhalter had more experience making arguments on bankruptcy issues to the Bankruptcy Court.

Winterhalter and Bernheim spoke two (2) days prior to the hearing on December 14 to review Bernheim's testimony.  On December 14, 2020, in preparation for a hearing before this Court and in an exercise of due diligence, Winterhalter had a 27-minute discussion to review Bernheim's anticipated testimony during the hearing on the Motion to Dismiss. See Ex. 19.  They discussed, among other things, the November 6 events, the order of witnesses and who should testify about the events.

On December 17, 2020, after testifying, Bernheim stated his belief that the formalities of a corporate vote on November 6, 2020, had been met under Pennsylvania law.  In fact, DVLT briefed the issue in the District Court Action in the Motion for Summary Judgment. Exhibit 20. Winterhalter reached the same conclusion as to the validity of the Resolution. Bernheim expressed concern in his email that the Court was focused on the formality of the vote.  On the same date, Bernheim's firm provided to Winterhalter an Legal Memorandum addressing the validity of DVLT's approval of filing bankruptcy and that shareholder approval was not required. Exhibit 21. The full transcript of the Court's ruling is appended as Exhibit 22.

### THE CIRCUMSTANCES SURROUNDING THE FILING AND ULTIMATE DISMISSAL OF THE CASE DO NOT MEET THE STANDARDS FOR IMPOSITION OF SANCTIONS UNDER (A) 11 U.S.C. §105; (B) 28 U.S.C. § 1927; (C) INHERENT AUTHORITY OR (D) B.R. 9011

The Motions seek the imposition of sanctions against one or both Counsel under as many as four (4) separate legal bases[4].  Based on the factual information known to Counsel, being familiar with the Bankruptcy Code, being familiar with corporate law regarding meetings (including the Bylaws of DVLT (Exhibit 23) and Shareholders' Agreement (Exhibit 24),

---

[4] The Motion of the UST seeks sanctions only under B.R. 9011 and 11 U.S.C. §105(a) against Winterhalter.

researching common law and believing that Jack, John and Bernheim would testify fully, accurately and with sound recollection about the events on November 6, 2020, Counsel acted in good faith when it filed the petition to advance DVLT's goals and to protect the equity interests in DVLT. Counsel concluded that these benefits outweighed any harms possibly associated through the institution of this proceeding.

The issue before the Court presently is whether the actions of Counsel were proper and appropriate under the circumstances when filing the petition. Counsel's rationale, in good faith, included the following:

1.    <u>Desirable Process for Liquidation.</u>  Jim is seeking the liquidation of DVLT so he can realize the best value for his equity in DVLT.  Hopefully all interested parties and the Court share the belief that the bankruptcy process is a better forum for selling assets: where the buyer desires an order authorizing the sale free and clear of all liens, claims, interests and encumbrances; it is more experienced at promptly reviewing and authorizing the best sales procedures for maximizing a purchase price on behalf of the Estate than other courts; and bankruptcy procedures enable all interested parties the opportunity to be heard on their individual concerns.

2.    <u>Directors' Position.</u>  Two-thirds of the Directors of DVLT had more confidence in the procedures and efficiency of the Bankruptcy Court to realize the highest and best purchase price for DVLT's assets than any other available method under the circumstances described above.

3.    <u>Continuing Expense</u>.    DVLT, as a party to the District Court Litigation, was spending significant funds while being in the middle of Jack's and Jim's continuing disputes.   The bankruptcy court would place the interests of DVLT and its creditors ahead of the interests of its two (2) owners and provide for an efficient and transparent sale process.

4.    <u>Continuation of Operations</u>.  The existing management of DVLT has considered ceasing operations and winding-down of the business to terminate the continuous family conflict. Bernheim suggested there is no management for DVLT that can competently operate the business better than Jack.  The majority opinion of the Directors was that the value of DVLT will decline prospectively if there is not an orderly sale procedure adopted, which this Court can supervise.

5.    <u>Solvency</u>.  The Court was critical of DVLT filing bankruptcy when it is solvent. The Bankruptcy Code does not require insolvency in order to file a petition, and there are numerous instances when solvent debtors file bankruptcy such as poor cash flow, relief from litigation through the automatic stay, providing an open forum that may prevent additional litigation among suspicious creditors or potential claims and more.  The Bankruptcy Code clearly contemplates cases involving solvent debtors.  The Bankruptcy Code requires that an unsecured claimholder of a solvent debtor receive "payment of interest at the legal rate from the date of the filing of the petition…." 11 U.S.C. §726(a)(5). Although the requirements of Chapter 7 typically do not apply to Chapter 11 cases, Section 726 of the Bankruptcy Code applies indirectly through the "best interest of creditors" test in Section 1129(a)(7) of the Code, which requires that distributions proposed under a Chapter 11 plan must at least equal the amount such holder would have received under a Chapter 7 liquidation.

6.    <u>Not a Traditional Two-Party Dispute in Bankruptcy.</u>  The Court has evaluated this case under the principles of a Two-Party Dispute.  While this is proper, there is more below the surface than just a war between Jim and Jack.  Often, the Two-Party Dispute involves a debtor, a single creditor and a state law cause of action.  DVLT scheduled six (6) secured creditors and fifty-five (55) unsecured creditors impacted by the ongoing disputes among ownership of DVLT. Placing DVLT under the supervision of the Bankruptcy Court protected those creditors from non-

payment or untimely payment.  The Debtor sought to promptly sell its assets - - much faster than would occur in Chapter 7 and the benefit of maintaining operations during the court proceedings. Counsel believed that the benefits of filing outweighed the harms associated with a Two-Party Dispute.

7.    <u>Automatic Stay</u>.  The Court mentioned in its ruling a suspicion held by Jack that the filing of this case would stay all of the District Court Litigation.  An expedited sale could occur, the proceeds of sale could then be identified for the District Court Litigation as the sums in issue and for disposition, ultimately, through the District Court Litigation.   The filing of this bankruptcy proceeding would not prevent the District Court from ruling on the Motion for Summary Judgment or issues therein. Rather, this case resulted in the same relief of sale/liquidation as requested by Jim – just as to the Debtor.  Any other issues among Jim and the non-Debtor defendants were not stayed.  Counsel, the Debtor and Jim's counsel all knew this proceeding would only stay actions against DVLT – this is fundamental bankruptcy law.  DVLT did not seek injunctive relief for any other defendants nor was such action contemplated.[5]  During the hearing on November 24, 2020, Winterhalter acknowledged only DVLT would receive the benefit of the stay.  Jim and Jack would continue their battle against each other and third parties while DVLT received protection.   Thus, this filing would not result in a change in forum for Jim and Jack to litigate.   Invoking the automatic stay so that bankruptcy procedures would be applied instead of a receivership proceeding to liquidate DVLT's actions is a more economically efficient and transparent approach which would benefit both Jim and Jack.

8.    <u>Expedited Sale Procedure.</u>  The Court criticized Counsel and the Debtor for promptly seeking the Court's ruling on expedited bid procedures motion.  Best Line's position

---

[5] See November 24, 2020 Transcript, p. 17, Ex. A to James' Motion, pp. 4-7.

prior to filing was that it would not proceed with the sale if the process did not occur on an

expedited basis. This was not an unusual demand since a natural consequence of a business

bankruptcy is some normal disruption and hesitancy with certain vendors and creditors.  Best Line

would be fearful of the adverse consequences such business disruption may cause.  The Court

heard Best Line's counsel repeating this position at the hearing on the Motion to Expedite.[6]

Counsel had good reason to rely upon Best Line's demand for promptness.  This proposal

was the only reasonable offer received by DVLT after several months of consideration.  As part

of bankruptcy process, Jim would have every opportunity to voice his concerns over the methods

and procedures for any sale.  Counsel objectively thought the Court would support the rational for

filing the case outweighed the reasons to dismiss the case as merely Two-Party Dispute, or that

the filing was a mere litigation tactic, forum shopping, issues in dispute existing solely under state

law, or that there was no rational purpose for a controlled sale through bankruptcy.

No Conspiracy to Defraud.

Most importantly, the present Motions before the Court are based on the Court's statements

that the Debtor, Jack, and John had no rationale or legitimate basis for believing there was

sufficient corporate authorization to file a bankruptcy petition after November 6, 2020.  The

Court's conclusion is based in large part upon the testimony of Bernheim, Jack and John.

Bernheim's testimony was a complete surprise to Winterhalter.  On December 14, 2020,

Winterhalter conducted a call with Bernheim to review his anticipated testimony. The time record

of this phone conference is appended as Exhibit 19.  Even the testimony of Jack and John was not

as assertive and definitive as Winterhalter expected.  Understandably, the Court placed the absence

---

[6] See November 24, 2020 Transcript, p. 17, Ex. A to James' Motion:  "MR. POORMAN:  We understand that, Your Honor.  If the timetable that we have in mind is not palatable to the Court, we respect that and we will likely go away and look for other opportunities."

of Bernheim's memory of the event as a critical factor in discrediting the testimony of Jack and John about the communications and events that transpired.  Counsel, however, did not manufacture the planning, discussion or actions of Jack and John as Directors and on behalf of shareholders, which were the results of much discussion and planning for months among Jack, Bernheim and Winterhalter.  Counsel should not be sanctioned due to weaknesses in witnesses' testimony.

Bernheim is a good attorney, respected and certainly competent.  This makes his testimony before the Court even more surprising.  As is shown by the Exhibits, Bernheim, Jack and Winterhalter devoted a significant period of time attempting to determine whether the sale of the business through bankruptcy was a desirable route and whether DVLT authorized it.  There was significant planning involved.  Then, after communicating with Best Line, DVLT took steps to effectuate the stalking horse's desired goal of expediting the process as much as possible.

On October 26, 2020, Counsel distributed the Notices pursuant to the Bylaws and Jack's authorization. In response, Jim demanded an inspection of documents.  Pennsylvania law does not mandate that a noticed special meeting be postponed because a shareholder issued a statutory demand for documentation or claimed unavailability prior to the scheduled meeting. Regardless, DVLT responded timely to the statutory demand.  See Exhibits 4, 5, 7 and 8.  The parties were negotiating and the meetings remained scheduled.  DVLT and Counsel attempted to accommodate the purported unavailability of Jim and his Counsel (Exhibit 5), but it proved unnecessary as Jim and his advisors participated in a gathering of all shareholders and directors on the date originally proposed for the Special Meetings.

On November 4, 2020, Winterhalter sent the invitation through Teams to participate in the conference. The Notices of Special Meetings were previously issued.  Teams automatically identifies such invitation as a "Microsoft Teams Meeting."  In hindsight, Counsel should have

better identified the subject, which states "Delaware Valley Lift Truck, Inc. – Negotiations/Evaluation on Sale of Business-Global Settlement." In DVLT's management's view, and its counsels' view, those Notices were not retracted. The subject of the Teams Meeting invitation included "Evaluation of Sale of Business", which was the subject of the Notices of Special Meetings as was bankruptcy in order to transparently approve the sale and effectuate the transaction. The failure to reference the work bankruptcy filing in an automated invitation for a telephone or video conference in Teams was inadvertent at worst, but it is certainly not grounds for sanctions. Prior communications during the preceding days included the bankruptcy reference.

Weighing against a finding of a large conspiracy to defraud was Counsel's communications of the bankruptcy filing. Counsel promptly noticed the Office of the UST. Counsel placed spotlight on this case as soon as it was filed and brought it to the attention of the UST anticipating challenges by Jim. Exhibit 16. Counsel expressly advised counsel for Jim that his ultimatum was unacceptable and the sale and the bankruptcy filing would proceed. Exhibit 15. This was not an attempt to hide conduct or slip something past Jim or the UST. Exhibits 16 and 18.

Most important, Mr. Bernheim's written communications are more reliable than his memory and testimony. During and after the November 6, 2020 meeting, Bernheim's several written communications demonstrated his belief that the Resolution was proper and reflected the actions of the Directors and Shareholders. Not only was it confirmed by Bernheim, but it was supported by a legal memorandum prepared by another counsel within his firm. See Exhibits 6, 13 (no disagreement as to the Resolution), 20 and 21.[7]

---

[7] The Memorandum of the Wilentz Firm is being submitted in camera, subject to a joint defense privilege.

With respect to oral communications, Jack, John, Bernheim and Winterhalter had a conversation lasting 20 minutes[8] after Jim left the meeting.  The existence of a conversation should not be in doubt.  Furthermore, Jack's and John's testimony verified the meeting.  The attendees had discussed the sale and bankruptcy for months.  The length of the call is supportive that a review of Jim's recalcitrance, the Directors and Shareholders evaluation and a decision to file among Jack and John after considering Jim's position.

On December 14, 2020, Winterhalter and Bernheim prepared for his testimony and reviewed his testimony.  See Ex. 19.  On December 16, 2020, due to scheduling challenges during the hearing, Bernheim requested that his testimony be taken out of order.

When asked a direct question by the Court relating to his recollection of what transpired during the extended conference call, Bernheim responded as follows to the questions of the Court regarding the meeting on November 6, 2020.

> JUDGE CHAN:  You, Mr. Winterhalter, I think are trying to persuade me that there was a substantive discussion about a bankruptcy filing and a sale.  Regardless of – I mean I'm sure you're going to give me some more testimony later on, but I think that Mr. Green clearly testified that he was asked several times whether his client would consent to a bankruptcy filing or a sale.  And he said no.  And I think that he explained that he wanted more information before filing for a bankruptcy, you know?  Mr. Karalis is going to characterize that as he was just answering a question.  And you're going to try and characterize it as this was a board meeting.  This is a shareholder meeting.
>
> So I don't – I'm not sure how much more Mr. Bernheim can add to this.  I guess the big question in my mind is that it just seems like it was a meeting and Mr. Green dominated the meeting.  And then it looks like all the parties on Jim Meyer's side left, but it sounds like something else happened.  So if there was some other – was there anything else that happened at the meeting, Mr. Winterhalter that – you know, like could Mr. Bernheim say that when they hung up the phone, was there any subsequent discussion or was that it?  When those individuals, Mr. Green and Mr. Mitchell, when they left the meeting and Mr. Jim Meyer left the meeting, was there any further discussion or was that it as far as you know?

Exhibit 22, page 105, lines 2 - 25).

---

[8] Exhibit 19.

JUDGE CHAN:    Okay.  So Mr. Bernheim, just answer this question for me, do you have any recollection that after Mr. James Meyer left the call, after Mr. Gary Green left the call, after Mr. Mitchell left the meeting, was there any substantive discussion among the remaining people on the Microsoft Teams video call?  And if you don't know, you can say –

THE WITNESS:    I don't recall.

See Exhibit 22, page 106, lines 10 – 17).

This response by Bernheim was completely unexpected.  As shown in Exhibit 10 and as later testified by Jack and John, Bernheim participated in the extended call and ***requested*** Winterhalter's continued participation to authorize the bankruptcy filing.  Counsel sent the Identification of Remote Witnesses to the witness and prepared Bernheim for his testimony.  Moreover, Bernheim offered to testify so Winterhalter could address legal arguments to the Bankruptcy Court since he could not testify and advocate.  It is not logical for Counsel to call a corroborating witness (Bernheim) if his testimony was not going to support the client's position.

 Bernheim's testimony, in response to the Court's question whether there were substantive discussions during the second part of the Team's call, was: "I don't recall," which  gave the Court good reason to question Jack's and John's separate testimony.  Winterhalter thought he knew what Bernheim would say after reviewing his testimony on December 14 and prior communications with Bernheim.   Winterhalter would not have offered Bernheim's testimony if Winterhalter knew Bernheim  did not recall what took place on November 6. Winterhalter anticipated that Jack's and John's testimony would outweigh and overcompensate for Bernheim's lack of clarity in his testimony. Unfortunately, Jack and John's testimony failed to convey with sufficient clarity the discussion.

Counsel is puzzled why Bernheim's recollection was poor during the hearing. For whatever reason, Bernheim seemed rattled by rather innocuous questioning and rambled. See Exhibit 22, page 98 - 104.

On December 17, thhe day following Bernheim's testimony, Bernheim wrote to Winterhalter confirming that he thought the formalities of a corporate vote had been met under Pennsylvania law on November 6, 2020. Exhibit 20. Winterhalter reached the same conclusion. Bernheim nevertheless expressed a concern in his email that the Court was focused on the formality of the vote. On the same date, Bernheim's firm provided to Winterhalter an independent Legal Memorandum addressing the validity of DVLT's approval of filing bankruptcy and that shareholder approval was not required. Even if the Court disagrees with Counsel's conclusion that the filing was authorized, Counsel should not be sanctioned when competent co-counsel for DVLT reached the same conclusions. Exhibit 21. Counsel had a good faith basis and legitimate purpose of this filing. It was not done in secrecy and the steps taken were designed to accomplish DVLT's goals.

<u>Legal Support for Corporate Authorization</u>

Under Pennsylvania law, the Board of Directors and Shareholders may act after notice of a meeting even when a Director and Shareholder leaves a meeting. In this case, the Court concluded that there was no Special meeting of the Directors and Shareholders. While the Court reached such conclusion and dismissed the case, this should not lead to the imposition of sanctions where Counsel had a good faith belief and good reason to conclude that DVLT properly authorized the filing of bankruptcy under its Bylaws, Shareholders Agreement and the Resolution.

DVLT issued proper Notices of Special Meetings with appropriate lead time. All directors and shareholders received them. In response, Jim demanded documentation permitted by statute.

21

The demand, however, did not invalidate or postpone the effect of the Notices.  The Directors and Shareholders meetings were scheduled among the three (3) directors, two (2) shareholders and the individual holding the tie-breaking vote for the two (2) shareholders. A meeting of those participants ensued, the issues were discussed and Jim, through his counsel, refused to participate in any decision unless his demands were met.  Jim and his advisors then disconnected from the meeting, and Jack and John further engaged in the process of approving the corporate actions recognizing Jim's opposition.  Unanimous consent was not required.

The common law of the Commonwealth and in the State of Delaware, a respected state interpreting corporate procedure, do not allow a recalcitrant shareholder to avoid his responsibilities to act in the best interests of the corporate entity by being unavailable or not participating in a decision.

> But when a quorum is once present, the meeting organized and transacting business however little, there must under the authorities some justifiable reason for withdrawal by anyone to break the quorum, before such withdrawal can be allowed the effect of destroying the meeting. It has in substance been held by courts and stated by text writers, that if the withdrawing stockholders are animated by a purpose solely to destroy the meeting by breaking a quorum because of whim, caprice or chagrin, the law will consider their action as unavailing and will permit the meeting to proceed. *Com. ex rel. Sheip v. Vandegrift*, 232 Pa. 53, 81 *A.* 153, 36 *L. R. A.* (*N. S.*) 45, *Ann Cas.* 1912C,  1267; *Re Argus Printing Co.*, 1 N.D. 434, 48  N.W.  347,  12 *L.  R.  A.* 781,  788,  26 *Am.  St.  Rep.* 639;  2 *Thompson  on Corporations*, (*3d Ed.*) *p.* 300 *et seq.;* 3 *Cook on Corporations*, (8th *Ed.*) *p.* 2112.

*Hexter v. Columbia Baking Co.,* 16 Del. Ch. 263, 268, 145 A. 115, 117 (1929). Also see *Berlin v. Emerald Partners*, 552 A.2d 482, 493 (Del. 1989) (Just as the quorum once established will not be defeated by a stockholder who participates in part of the meeting but does not vote or leaves the meeting, it also will not be defeated because the stockholder who is present by proxy did not provide authority for his representative to vote on all proposals).

Pennsylvania also follows this approach. When a quorum is present, the result is determined by the votes cast.

> The accuracy and legality of the proceedings had by the stockholders and board of directors of the defendant corporation has been attacked. It appears from the record that at the stockholders' meeting held Sept. 29, 1923, a quorum was present When it appeared what was the nature of the business to be transacted at the meeting, Mr. Kennedy withdrew all proxies standing in his name, aggregating $ 18,630 par value, and Mr. March, another petitioner, withdrew all proxies standing in his name, both of them announcing that they did so on advice of counsel. It was contended that these withdrawals left less than a quorum present, whereupon the meeting adjourned until Oct. 4th. We cannot agree with this contention. If a corporate meeting is once organized and all parties have participated, no person or faction can then, by refusing to vote or by withdrawing, thereby defeat the organization or render the subsequent proceedings invalid. **The stockholders who attend the meeting and then without cause voluntarily withdraw are in no better position than those who voluntarily absent themselves in the first instance**: *Com. v. Vandegrift*, 282 [sic] Pa. 53; *Lutz v. Webster*, 249 Pa. 226, 230; *Stryjewski et al. v. Panfil et al*., 269 Pa. 568.

*Commonwealth ex rel. Ins. Comm'r v. Exch. Operators, Inc.*, 11 Pa. D. & C. 465, 470 (C.P. Ct. 1928) (emphasis added).  In *Lutz v. Webster*, 249 Pa. 226, 94 A. 834, an election was ordered where four-fifths of the outstanding stock was necessary for a quorum and the holder of more than one-fifth was defeating a quorum by absenting himself as he had been doing for three years.

> In any event,  a meeting properly constituted cannot be deprived of the right to transact the business for which it was called by the refusal of certain members present to participate therein or by their capricious withdrawal therefrom: *Com.* ex *rel. v. Vandegrift*, 232 Pa. 53*; Lutz v. Webster, 249 Pa. 226*; Thompson on Corporations (2d ed.), sec. 910.

*Stryjewski v. Panfil*, 269 Pa. 568, 572, 112 A. 764, 765 (1921).

Also, votes at separate meetings may be considered as a single vote.  This is a logical result where a director or shareholder abruptly leaves a meeting, particularly among family members. See *Duffy v. Loft, Inc.,* 17 Del. Ch. 140, 148-49, 151 A. 223, 227 (1930)(citing *In re Cedar Grove Cemetery Co.*, 61 N.J.L. 422, 39 A. 1024 (1898), where a court found the result of an election by assembling the polls of two rival meetings and ascertaining from the combination of both who had

received a majority of votes.) The case of *Gow v. Consol. Coppermines Corp.,* 19 Del. Ch. 172, 165 A. 136 (1933) is in accord with *Cedar Grove Cemetery* that when a stockholders' meeting breaks into two parts, it is reasonable to regard the two as one for the purpose of determining the result of a vote, if that can be done without jeopardizing the accuracy of the result. Id. at 198.

On the morning of December 17, 2020, Bernheim reiterated his belief the meeting process was appropriate under the Pennsylvania Business Corporation Law.  Counsel still believes that Bernheim's view is correct.  Sufficient formalities were met for the Resolution to be effective.

In *Commonwealth v. Eakin*, 120 A.3d 1053 (Pa. Super. Ct. 2015), the Court noted the testimony of an expert witness that the formalities used in meetings of directors and shareholders in large corporations are not necessary the same used in small, family-operated businesses.

> Attorney Martin discussed one of his areas of legal expertise, that of corporate law, formation, financing and governance as it applied to ADU, a closely held corporation. **He explained the differences in various corporate formations in existence under Pennsylvania law and noted that in a closely held corporation—most often associated with small, family-owned, businesses— those who own the company are also in control of its day-to-day operations.** *Id.* at 144-47. Attorney Martin further explained that notwithstanding the familial ties that might underlie a small, closely-held family corporation, there are requisite formalities under Pennsylvania law that must be complied with. *Id.* at 149-50. **The requisite formalities require *inter alia* that shareholder or directors' meetings be held and records of such meetings where resolutions or decisions are made be kept. It is typical, per Attorney Martin's testimony, that strict adherence to the corporate formalities is not always the case in these family-run businesses.** *Id.* Recognizing this, **Attorney Martin testified, our courts generally do not hold closely held corporations such as ADU to the same level of formality, as that of a larger corporation.** *Id.* at 150, *ll.* 12-16. This, then likely explains why ADU, operated as a family-run, closely held corporation did not always formalize decisions made by the operating officers. In fact, we heard testimony from Rob that often times informal meetings were held throughout the workday, various subjects talked about and things were just done. See N.T. Jury Trial Day 1, p. 85, *ll.* 1-16; p. 86, *ll.* 16-18. Frequently, such decisions never made their way into the board meeting minutes in a formalized way. Nevertheless, some corporate actions  such  as  issuing  shareholder  draws  from the corporate account did follow a recognized procedure.

*Commonwealth v. Eakin*, 120 A.3d 1053 (Pa. Super. Ct. 2015)(Emphasis added).

An analogous case arose under Massachusetts law where a brother sought dismissal of a corporate claim filed against him on the basis that the Board of Directors did not comply with corporate formalities before filing suit.  The appellate court stated as follows affirming the decision to not dismiss the case:

> Phillip contends that action by the corporations required a corporate meeting to authorize this suit. . . .  Phillip argued to the judge that bringing a suit against a director is such an extraordinary act that it requires a meeting and vote of the directors. Even if we were to accept the assertion that a meeting of the directors is necessary to commence litigation for misappropriation against a director in a closely held corporation, we find Philip's argument unavailing under these circumstances. **Two of the three directors of each corporation signed the complaint**. By the time his misdeeds were discovered, Phillip had abandoned his positions in the companies. There is nothing to suggest that he would have participated in a meeting if one had been called. Moreover, he participated in the litigation, and even brought counterclaims and third-party claims without raising the defense of lack of corporate authority. He waited until trial to suggest that the corporate plaintiffs lacked corporate authority. **There is no indication that a corporate meeting would have been anything other than a formality as only a majority vote of the directors was necessary to take action**…. **"This was a small family corporation conducted without overemphasis on corporate formalities and reasonably is not to be held to the strict standards of larger commercial organizations."** *Trager* v. *Schwartz*, 345 Mass. 653, 658-659, 189 N.E.2d 509 (1963) (finding no error in the judge's decision that signatures by the majority on a trust amendment was enough to authorize a required waiver in lieu of a vote by the board of directors). Perhaps most importantly, Philip was a long-time director, officer, and shareholder of the closely held plaintiff corporations, all of which historically had paid little attention to corporate formalities in terms of meetings and even record keeping. In the circumstances of this case, therefore, Philip cannot reasonably rely upon the absence of a formal meeting to shield himself from liability for his misdeeds. See *Samia* v. *Central Oil Co.*, 339 Mass. 101, 109, 158 N.E.2d 469 (1959) (noting that in a "laxly handled family situation, where no rights of creditors or outsiders are involved, . . . undue emphasis cannot fairly be placed upon strict compliance with corporate formalities"); *Diamond* v. *Pappathanasi*, 78 Mass. App. Ct. 77, 96, 935 N.E.2d 340 (2010) (noting "family business entities are typically operated in a decidedly looser manner than ordinary business entities"). While we do not condone an absence of formalities in operating closely held corporations, neither will we allow a director who had been complicit in years of informality, including years without any formal directors meetings, to rely on the absence of a formal meeting to shield him from requiring to respond to allegations of misappropriation. "Where rights of creditors or other outsiders are not involved, actions taken without compliance with

25

corporate   formalities   have   frequently   been   held   to   bind
shareholders." *Pitts* v. *Halifax Country Club, Inc.*, 19 Mass. App. Ct. 525, 532-533,
476 N.E.2d 222 (1985).

*Houser Buick, Inc. v. Houser*, 89 Mass. App. Ct. 1113 (2016).  Also see *Samia,* 339 Mass. at 109-

110, (Where rights of creditors or other outsiders are not involved, actions taken without

compliance with corporate formalities have frequently been held to bind shareholders.)   The

relaxation of formality is understandable where all of those involved are family-members and

directors have been elected based on consanguinity rather than, perhaps, business acumen for

purposes of making decision.

The  requisite formalities for  DVLT  to  authorize  bankruptcy were  met  and  followed

DVLT's Bylaws.  The Notices were issued for a specific date and time.  The Directors, through

counsel, coordinated the call albeit through the Teams invitation. Due to Covid and through the

use of technology, all directors and shareholders were all present in a virtual room. Thus, a quorum

was present. The attendees could all be heard or otherwise meaningfully participate in the meeting,

and they did.  There was a simultaneous, continuous presence and assembly of all the Directors

and shareholders (and the person holding the tie-breaking shareholder vote) and even their counsel,

although Jim's counsel dominated and interrupted the meeting advocating Jim's demanded points

to the exclusion of others until Jim left the conference call.

The Directors and shareholders talked about the proposed actions (sale of the assets and

filing bankruptcy to have the sale authorized) during the meeting. Jim's position was requested,

and Jim made his position clearly known.  Jim left the meeting.  The remaining Directors and tie-

breaking shareholder votes were discussed and cast against Jim's position and in support of the

actions identified in the Notices.  No greater formality was needed after many months of struggles

and litigation.   Nothing else was required for the Board and Shareholders to reach a decision, with

Jim's vote being negative on the Resolution and Jack and John voting in favor.

Again, a father and his two arguing sons were present at the November 6, 2020 meeting.

One son left the meeting and his contrarian position was known. The remaining Directors and

Shareholders could act in light of the history of animosity among Jim and John.   Recognizing all

of the individuals being represented by counsel, with notice being sent, with Jim declaring his

position, there was sufficient formality for the remaining directors to approve the resolution as

well as shareholders through John casting the tie-breaking vote.   See generally *M4 Holdings, LLC

v. Lake Harmony Estates Prop. Owners' Ass'n*, 237 A.3d 1208, 1215 (Pa. Comm. Ct. 2020)

(applying rules applicable to nonprofit entities to find that a series of email correspondence

exchanged (not a meeting) between the members of the Board over a period of two days was not

enough to constitute a meeting). Moreover, a Resolution was created to serve as a record of the

events and it was placed in the corporate minute book.

In the event the Court concluded that the necessary formality was lacking, such formality

authorizing a bankruptcy filing may be cured through ratification.   Apart from the "voluntary"

requirement of 11 U.S.C. § 301, the Bankruptcy Code does not specifically establish the internal

requirements for the initiation of a voluntary corporate bankruptcy proceeding. In *Price v.

Gurney*, 324 U.S. 100, 104 (1945), the Supreme Court recognized that "the initiation of . . .

[bankruptcy] proceedings, like the run of corporate activities, is left to the corporation itself, i.e.,

to those who have the power of management." The Court then stated that management power is

governed by state law. *Id.* Also *Keenihan v. Heritage Press,* 19 F.3d 1255, 1258 (8th Cir.

1994) (citing *Price v. Gurney*, 324 U.S. 100, 106, (1945)); *Hager v. Gibson*, 188 B.R. 194, 197

(E.D. Va. 1995), *aff'd*, 108 F.3d 35 (4th Cir. 1997),   *aff'd in part, rev'd in part*, 109 F.3d 201 (4th

Cir. 1997); *In re American Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D. N.Y. 1996), and the

corporate by-laws.

*Citizens and N. Bank v. Monroe Heights Dev. Corp.*, (*In re Monroe Heights Dev. Corp.*),

2017 Bankr. LEXIS 2355, *19 (Bankr. W.D. PA 2015), stated clearly that under Pennsylvania law

it is generally the board of directors that has the authority to file a bankruptcy for a corporation

(citing *In re Indus. Concerns, Inc. (In re Indus. Concerns, Inc.),* 289 B.R. 609 (Bankr. W.D. Pa,

2003)).    Also, DVLT met the requirements of 15 P.S. §1903.    The majority of the Board of

Directors, by resolution, and with the vote of the Shareholders under the Bylaws and in conformity

with the Shareholders' Agreement authorized the filing of a voluntary petition in bankruptcy.    The

two 50% shareholder/brothers had a deadlock broken by their father pursuant to the Shareholders'

Agreement.    See Exhibit 24, Paragraph 26.

Even if the Court deems the Resolution to be defective, the Court should have permitted

DTLV to correct any defect through ratification if authorization was a determinative fact.    *See

Orfa Corp. of America v. Coppello,* 115 B.R. 799 (Bankr. E.D. Pa. 1990) (recognizing that chapter

11 debtor could avert dismissal of an unauthorized petition by the subsequent ratification of the

petition by the debtor's properly constituted board); *Be-Fit Health & Racquet, Inc. v. Healthtime

Racquet & Fitness Club, Inc. (In re Be-Fit Health & Racquet, Inc.*), No. 90-11254S, 1997 Bankr.

LEXIS 2436, 1997 WL 34726325 (Bankr. E.D. Pa. Nov. 4, 1997) (acknowledging that ratification

of a previously-filed bankruptcy petition is authorized under Pennsylvania law). *Generally, see

Wilmington Tr., N.A. v. Pinnacle Land Grp., LLC (In re Pinnacle Land Grp., LLC),* Nos. 17-

23339-GLT, 52, 75, 2018 Bankr. LEXIS 2764, at *21 n.125 (Bankr. W.D. Pa. Sep. 10, 2018) and

*In re Crest by The Sea LLC*, 522 B.R. 540, 546 (Bankr. D.N.J. 2014).

The rationale applied in the case of *In re S. Canaan Cellular Invs., Inc.,* 2009 Bankr. LEXIS 2967, at \*20-21 (Bankr. E.D. Pa. May 19, 2009) is instructional. The Court had before it a motion to dismiss. The Court considered various indicia of a bad faith filing. The Court noted that the existence of one or more such indicia does not compel a finding that the debtor filed its bankruptcy petition in bad faith. Rather, a court must consider all of the relevant circumstances surrounding the filing, giving due regard to the congressional purposes behind Chapter 11. The Court recognized that even if a chapter 11 debtor is not operating and has no employees, its bankruptcy petition may be in good faith if it is designed to maximize the value of its assets for creditors and equity security interests. *In re S. Canaan Cellular Invs., Inc.,* 2009 Bankr. LEXIS 2967, at \*20-21 (Bankr. E.D. Pa. May 19, 2009) (citing *In re American Capital Equip. LLC*, 296 Fed. Appx. 270, 2008 WL 4597221, at \*3 (3d Cir. 2008); *Solow v. PPI Enters.(U.S.)* (*In re PPI Enters.(U.S.)),* 324 F.3d 197, 201 (3d Cir. 2003) (debtor's sole asset was a valuable stock certificate and had but one employee).

While Bernheim had concerns about the formality of the roll call, Counsel and Bernheim still concluded that the requisite formalities were sufficiently present on November 6, 2020. Even if this Court concludes to the contrary, and that DVLT was not entitled to ratify the Resolution through a subsequent meeting, these facts do not support the imposition of sanctions. Counsel believed Jim's conduct reached the point that he would block any attempts to have meetings of the Board and the Shareholders on any issues unless he wanted the issues approved. This conclusion of Counsel was not reached in bad faith.

**A.**

**11 U.S.C. §105(a)**

Pursuant to §105 of the Bankruptcy Code, a court may "sanction an attorney who multiplies proceedings unreasonably and vexatiously under the same circumstances and standards that would warrant sanctions under 28 U.S.C. § 1927." *Troost v. Kitchin* (*In re Kitchin)*, 327 B.R. 337 (Bankr. N.D. Ill. 2005). "'Bad faith, for the purposes of section 105 is characterized as an attempt to abuse the judicial process.'" *In re Parsley*, 384 B.R. 138, 179 (Bankr. S.D. Tex. 2008) (*quoting In re Gorshtein*, 285 B.R. 118, 124 (Bankr. S.D.N.Y. 2002)).

Importantly, it is improper for a party seeking an award of attorneys' fees to rely on the language in the bankruptcy court's decision to dismiss the chapter 11 case. This is because "[j]udicial opinion-writing style is well-known; after the judge equivocates in chambers and cogitates, with the decision wavering in the balance, the opinion is written in an adversarial fashion as if the court never had been dubitante and the outcome was always inevitable. This is deemed necessary, perhaps, on the theory that the law must seem certain to be respected." *HBA East*, Inc., 101 B.R. 411, 418 (Bankr. ED NY 1989). In fact, in *HBA East*, the bankruptcy court had previously dismissed the chapter 11 case on the determination that the former debtors had filed their Chapter 11 petitions as a litigation tactic; that the cases were a Two-Party Dispute involving non-bankruptcy law; that there was no evidence that creditors other than Movants were clamoring for payment; that the Debtors' business operation was highly speculative and the only assets of any value were vigorously disputed; that there was little money to run the business, and apparently no cognizable assets to fund a plan of reorganization. *Id.* at 413. However, even in light of those facts, the Bankruptcy Court denied the creditor's motion for Rule 9011 sanctions.

In Pennsylvania, Bankruptcy Courts have viewed Section 105 as something to be relied upon only as a "last resort" after considering B.R. 9011 and 28 U.S.C. §1927. *Citizens & N. Bank*

30

*v. Monroe Heights Dev. Corp. (In re Monroe Heights Dev. Corp.)*, No. 17-10176-TPA, 2017

Bankr. LEXIS 2355, at *14 (Bankr. W.D. Pa. Aug. 22, 2017) (citing *In re Rodgers*, 2011 Bankr.

LEXIS 3357, 2011 WL 4101265 *1 (Bankr. W.D. Pa. September 13, 2011).  Equally important,

DVLT and/or Counsel did not act in bad faith or vexatiously, wantonly or for oppressive reasons

when filing the petition and sanctions should not be awarded.  Moreover, the power to impose

sanctions pursuant to §105(a) should only be imposed where the conduct of a party or an

attorney is "egregious" and no other basis for sanctions exists. *Trokie v. U.S. Bank Tr. Nat'l Ass'n*

*(In re Trokie),* 590 B.R. 663, 675 (Bankr. M.D. Pa. 2018).

## B.
## 28 U.S.C. §1927

The Motions lack any support that Winterhalter: (1) multiplied proceedings; (2) in an

unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4)

doing so in bad faith or by intentional misconduct. All of those elements must be found in this case

before the Court may sanction an attorney under 28 U.S.C. § 1927.[9]

Section 1927 provides, in pertinent part, that "[a]ny attorney . . . who so multiplies the

proceedings in any case unreasonably and vexatiously may be required by the court to satisfy

personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such

conduct." 28 U.S.C. § 1927. *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90 (3rd Cir. 2008)

(omitting internal quotations); *See also DeBauche v. Trani*, 191 F.3d 499 (4th Cir. 1999) ("We

conclude as a matter of law that the filing of a single complaint cannot be held to have multiplied

---

[9] By its plain language, 28 U.S.C. § 1927 does not apply to non-attorneys like the Firm.  *Baker Industries, Inc. v. Cerberus Ltd.*, 764 F.2d 204, 209 (3d Cir. 1985) did not address the issue.   This decision was before Fed. R. Civ. P. 11 was amended to explicitly include law firms, and did not address the limiting statutory language of 28 U.S.C. § 1927.   The Third Circuit sanctioned a law firm pursuant to 28 U.S.C. § 1927 before Fed. R. Civ. P. 11 was amended to explicitly include law firms, and did not address the limiting statutory language of 28 U.S.C. § 1927. See *Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290, 1294 (9th Cir. 2015).

the proceedings unreasonably and vexatiously and therefore that § 1927 cannot be employed to impose sanctions."); *Rubakha v. Kenneth J. Breitbart & Assoc., P.A.,* 2014 WL 2452575 (D. Md. May 30, 2014) ("An attorney cannot be sanctioned under § 1927 just because the claim ultimately is found meritless.").

In general, 28 U.S.C.§1927's purpose is to impose a monetary sanction upon counsel who willfully abuse the judicial process by conduct tantamount to bad faith. *Merial*, *Ltd v. Intervet, Inc*., 437 F. Supp. 2d 1332 (N.D. Ga. 2006); *Footman v. Cheung,* 341 F. Supp. 2d 1218, 1223 (M.D. Fla. 2004); *In re French Bourekas,* 183 B.R. 695, 697 (Bankr. S.D.N.Y. 1995); *Matter of Capitol-York Constr. Corp*., 52 B.R. 317, 321 (Bankr. S.D. N.Y. 1985). Sanctions under 28 U.S.C. §1927 may only be imposed where there is a "clear showing of bad faith on the part of the attorney." *On Time Aviation, Inc. v. Bombardier Capital Inc*. 570 F. Supp. 2d 328, 331 (D. Conn. 2008)(*quoting Shafii v. British Airways, PLC,* 83 F. 3d 566, 571 (2d Cir. 1996)).

As presented in detail above, Winterhalter's actions were engaged following careful evaluation of the facts and circumstances and upon well-established legal principals. At all times he believed in good faith that legal authority in favor of maintaining this proceeding outweighed the issues normally associated with a Two-Party Dispute. Because the Court dismissed the case does not establish bad faith conduct by Winterhalter. *See In re Volpe*, 53 B.R. 46 (Bankr. M.D. Fla. 1985) (dismissing chapter 11 case filed primarily to delay a foreclosure but without a realistic possibility of reorganizing, but denying sanctions requested pursuant to 28 U.S.C. § 1927 because the case was not "filed solely for vexatious, oppressive, or other improper purposes."). In the Third Circuit, there must be a finding of willful bad faith on the part of the offending attorney before attorneys' fees and costs may be assessed under 28 U.S.C. §1927. *Baker Industries., Inc. v. Cerberus, Ltd.,* 764 F.2d 204 (3d Cir. 1985). If it were otherwise, an

attorney who might be guilty of no more than a mistake in professional judgment in pursuing a client's goals might be made liable for excess attorneys' fees under section 1927." Id. at 209.

Most important, for purposes of the statue, there is no factual basis to support that Winterhalter needlessly multiplied this proceeding.  Adversary proceedings were not improperly instituted nor were contested matters.  The element of "multiplying" is not present where Counsel is being faulted for filing the petition.  Seeking expeditious relief for sale procedures should not constitute bad faith where such action advanced the sale and the purpose of the filing.  If the Court denied the relief and Best Line ceased having interest, then the case could have been converted and the assets of DVLT sold to pay creditors and the equity holders. Although this Court did not agree with DVLT's argument, DVLT possesses good-faith arguments, which appears to be more than the debtor possessed in the *HBA* case (in which the chapter 11 case was dismissed because the case was a Two Party Dispute, was filed as a litigation tactic, and involved a debtor with no assets). Yet, the *HBA* court denied a subsequent sanctions motions. *HBA*, 101 B.R. at 415-16.

## C.
### Inherent Authority

This court has the inherent power to take steps necessary to address bad faith conduct even if the conduct falls outside a statute. The Third Circuit recognizes that its courts have certain implied powers from the nature of their institution. Imposition of sanctions pursuant to the court's inherent power are warranted when a party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Hilburn v. Bayonne Parking Auth.,* 562 F. App'x 82, 86 (3rd Cir. 2014).

Because of its very potency, inherent powers must be exercised with restraint and discretion.  A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.  *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45, 111 S. Ct. 2123, 2132-33 (1991).  Under a court's inherent power, a court may assess attorney's fees

only when a party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO*, 501 U.S. at 45.

Courts have this option when "fraud has been practiced upon it, or that the very temple of justice has been defiled. . ." *Id.* at 46. At least one court has held that in order to impose sanctions under the court's inherent powers, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith – that is, motivated by improper purposes such as harassment or delay." *In re Residential Capital, LLC*, 512 B.R. 179, 191-92 (Bankr. S.D.N.Y. 2014) (internal quotations omitted). Another court has held that "the threshold for imposing sanctions using the court's inherent powers is extremely high. The court should invoke its inherent powers if it finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled.'" *Parsley*, 384 B.R. at 179, *quoting Chambers*, 501 U.S. at 46. The court's inherent powers must be exercised with caution. *Chambers*, 501 U.S. at 50.

The Motions lack support for use of the Court's inherent powers, because nothing in the Motions support a finding that DVLT and/or Counsel "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *Chambers*, 501 U.S. at 45, or that "the very temple of justice has been defiled." *Id.* at 46.

### D.
### B.R. 9011

Under B.R. 9011 also, the Court must examine the facts and circumstances taken by counsel.  This sanction may not be awarded against a represented party.  B.R. 9011(c)(2)(A).  The standards for dismissing a case pursuant to the good faith requirement implied in 11 U.S.C. § 1112(b) are different than the improper purpose standard for imposing sanctions under Bankruptcy Rule 9011. Thus, dismissal of a case does not result in the imposition of sanctions under B.R. 9011 per se unless the court concludes that the case was presented for an improper purpose, the claims

34

were not warranted under existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law, the allegations or factual contentions have evidentiary support and the denials of factual contentions are warranted on the evidence .

The sanction imposed for violation of the rule must be limited to what is sufficient to deter repetition of such conduct or comparable conduct by other similarly situation.  It may include directives of a nonmonetary nature, an order to pay a penalty into court, or an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation. B.R. 9011(c)(2).

Detailed above are the efforts of Counsel to make a reasonable inquiry under the circumstances into the factual and legal support for filing the case.  *See* B.R. 9011(b).  Counsel believed that the filing was appropriate, and the reasons in favor of filing the case would outweigh the Court's concerns over this being solely a Two-Party Dispute.  The Court may have believed Counsel was incorrect, but that conclusion does not result in sanctions being imposed.

In a similar case, a bankruptcy court determined that cause existed for dismissal of debtor's case under 11 U.S.C.S. § 1112(b)(1) where the Court would not have approved the employment of counsel under 11 U.S.C.S. § 327(a), because the attorney was the debtor's sole equity security holder and thus, was not disinterested as defined by 11 U.S.C.S. § 101(14)(A).  Further, the debtor's petition was not filed in good faith, as it was essentially a single asset case  and a Two Party Dispute with a creditor.  The Court concluded that the case was filed primarily for the benefit of the automatic stay.  The case was dismissed, but the Court did not issue sanctions under Fed. R. Bankr. P. 9011(c), as imposition of an injunction on filing was sufficient to deter a subsequent bad faith filing. *United States Tr. v. Stone Fox Capital LLC (In re Stone Fox Capital LLC),* 572 B.R. 582, 584 (Bankr. W.D. Pa. 2017).  A *per se* rule for the imposition of sanctions is

inappropriate, particularly in an area of bankruptcy practice which is rapidly developing (i.e., bad

faith filings). *HBA,* 101 B.R. at 418.  Cf. *In re D & v. Constr., Inc.,* 150 B.R. 362, 363 (Bankr.

W.D. Pa. 1993) (where sanctions imposed in the amount of fees received to file the case);

*In re Nahas*, 95 B.R. 387, 388 (Bankr. W.D. Pa. 1989) (although finding a bad faith, abusive filing,

abstention was a sufficient remedy). Sanctions under 9011 are not warranted in this case and are

not necessary.

## E.
## Damages

Counsel would be remiss if they did not touch upon monetary sanctions.  Simply put,

sanctions are not appropriate in this case for the reasons set forth above. In general, a sanction

imposed for violation of Section 105, 28 U.S.C. 1927, the Court's inherent authority and/or B.R.

9011, should be limited to what is sufficient to deter repetition of such conduct or comparable

conduct by others similarly situated.  The sanction may include directives of a nonmonetary nature,

an order to pay a penalty into court, or an order directing payment to the movant of some or all of

the reasonable attorneys' fees and other expenses incurred as a direct result of its actions. Counsel

disclosed receiving $37,393 as compensation (See DE 69), which sum is not related to deterring

such conduct where Counsel was advocating for its client.  Certainly the damages sought by James,

in excess of $200,000, is not reasonable.  Four (4) opposing counsel charged more than $200,000

at rates of $775 per hour and $1,150 per hour.

The size of the fee requests of opposing counsel are indicative of: (i) the animosity between

James and Jack; and (ii) the complexity of this matter.  Mr. Karalis  has extensive experience in

bankruptcy law and is quite competent.  He utilized the services of Mr. Seitzer at a lower

rate.  These two (2) counsel were more than adequate to review the filing of the bankruptcy case,

the schedules, to oppose the expedited motion to establish bid procedures and to prepare and attend the hearing on the Motion to Dismiss.  Other counsel's fees were not necessary or reasonable.

The rates of Mr. Karalis and Mr. Seitzer are reasonable for this jurisdiction.  However, a review of the time entries demonstrates a significant amount of time spent on matters not directly related to the bankruptcy case.  There was much time on settlement issues, matters related to the District Court Litigation, strategizing with Green and Keller and other non-chargeable services.  It is unclear why addressing cash collateral issues and a motion to pay pre-petition wages would be a concern unless opposing counsel anticipated that the case would proceed and suggesting that the Court may find the case was not filed in bad faith.  Reviewing the schedules, communications with the UST and approximately 3 hours spent on the Objection to the Motion for expedited hearing on bid procedures (approximately 6 hours) is reasonable.  The time spent on preparing the Motion to Dismiss is at least ninety-three (93) hours.  This is excessive for a Motion to Dismiss or the matters presented were not as simple as a clear-cut a case of a "bad faith" filing, which is more evidence that Counsel proceeding under law and arguments that it believed supported the Debtor's position. Regardless, sanctions are not appropriate in this case.

WHEREFORE, the Paul J. Winterhalter, individually, and Offit Kurman, P.A. respectfully pray for the entry of an Order denying all relief sought by or on behalf of James Meyer and sought

by the Office of the U.S. Trustee for the Imposition of Sanctions and for such other and further

relief as this Court finds just and proper.

Respectfully submitted,

**OFFIT KURMAN, P.A.**


By: */s/ P.J. Winterhalter*
    PAUL J. WINTERHALTER
    401 Plymouth Road, Suite 100
    Plymouth Meeting, PA 19462
    Telephone: (267) 338-1370
    Facsimile: (256) 338-1335
    E-mail: pwinterhalter@offitkurman.com

**OFFIT KURMAN, P.A.**


*/S/ James M. Hoffman*
James M. Hoffman
Gregory P. Johnson
7501 Wisconsin Avenue, Suite 1000W
Bethesda, MD 20814
Telephone: (240) 507-1710
Facsimile: (240) 507-1735
E-mail:  jhoffman@offitkurman.com
       gjohnson@offitkurman.com

Dated: February 9, 2021