**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| Delaware Valley Lift Truck Inc., | : | |
| | : | Case No. 20-14408-AMC |
| Debtor | : | |
| _____ | : | |

**OPINION**

Ashely M. Chan, United States Bankruptcy Judge

## I.    INTRODUCTION

After the Court dismissed the above-captioned voluntary chapter 11 bankruptcy case filed

by Delaware Valley Lift Truck, Inc. ("Debtor" or "DVLT") for cause pursuant to 11 U.S.C.

§ 1112(b), finding that the case had been filed in bad faith and without proper corporate

authority, the United States Trustee ("UST") and James E. Meyer, a 50% equity holder of DVLT

("Jim" or together with the UST, "Movants"), each separately filed motions seeking sanctions

against Debtor's counsel, Paul J. Winterhalter, Esq. ("Winterhalter") under Fed. R. Bankr. P.

9011 ("Rule 9011") and 11 U.S.C. § 105(a) ("Section 105(a)" or "§ 105(a)"). Jim's motion for

sanctions ("Jim's Motion") also seeks sanctions against Winterhalter under 28 U.S.C. § 1927

("Section 1927" or "§ 1927"), and against both Winterhalter's law firm, Offit Kurman, P.C.[1]

("Offit Kurman"), under Rule 9011, 11 U.S.C. § 105(a), and 28 U.S.C. § 1927, and John W.

Meyer, the other 50% equity holder of DVLT and brother to Jim ("Jack" or together with Jim,

the "Brothers"), under 11 U.S.C. § 105(a) and Rule 9011 for certain conduct in connection with

the filing and defense of the bankruptcy petition.

---

[1] Offit Kurman is apparently a registered entity in multiple jurisdictions and as a result, is sometimes referred to as
Offit Kurman P.C., and at other times referred to as Offit Kurman P.A., depending on the relevant jurisdiction. *See*
Tr. of Consolidated. Hrg. on Motions for Sanctions ("Sanction Hrg. Tr."), Case No. 20-14408, ECF No. 170 at
50:5–52:9.

For the reasons discussed below, the Court concludes that Winterhalter's promotion of a bad faith bankruptcy filing, for the improper purpose of advancing Jack's personal goals, to the detriment of Jim and DVLT, thereby derailing litigation in another forum involving the Brothers, warrants sanctions jointly and severally against Winterhalter and Offit Kurman of $204,183.57 and against Winterhalter personally in the amount of $9,757.30.

## II.    FACTUAL & PROCEDURAL BACKGROUND

DVLT was founded in 1985 by John C. Meyer ("John"), the father of Jim and Jack. Tr. of Remote Hrg. Dec. 16th & 17th, 2020 ("Dec. Hrg. Tr."), Case No. 20-14408, ECF No. ("ECF") 110 at 167:21–168:2, 218:10-16.[2] As of November 10, 2020, the date DVLT's chapter 11 petition was filed ("Petition Date"), Jack served as the president of DVLT; Jim and Jack each respectively held a 50% interest in DVLT; and the Brothers, along with John, served as DVLT's only three directors (collectively the "DVLT Directors"). Dec. Hrg. Tr., ECF 109 at 40:22-23, 45:22, 51:23-52:2, 85:13–86:4, 93:2-9; *id.*, ECF 110 at 169:13–20; ECF 1 at 4. The powers and duties of the DVLT Directors, and the Brothers as 50% shareholders, were respectively set forth in the DVLT Bylaws ("Bylaws") and the DVLT Shareholder's Agreement, dated February 1, 2008 ("Shareholder's Agreement"). *See* Sanction Hrg. Winterhalter Ex. 23, 24; Sanction Hrg. Tr., ECF 170 at 83:17-84:23, 85:5-8, 98:11-13. Relevant to this case, the Shareholder's Agreement established the identities of the DVLT Directors as John, Jack, and Jim and set forth procedures with respect to corporate governance of all "major decisions" of the corporation which would require unanimous consent of the shareholders and set forth the process for

---

[2] The pagination of the transcripts for the hearings held on December 16, 2020, and December 17, 2020, found at ECF 109 and ECF 110, respectively, is continuous and therefore comprise the same document defined herein as "Tr. Dec. Hrg."

breaking a deadlock between the Brothers. Shareholder's Agreement at 15 ¶ 26(a), 16 ¶ 26(c).[3]

Specifically, paragraph 26(c) of the Shareholder's Agreement contemplated a tiebreaking vote to

be cast by John.[4] Shareholder's Agreement at 16 ¶ 26(c). Also relevant to this case, the Bylaws

established that, in order to have a quorum for the purpose of shareholder consideration of a

matter, it was required that a majority of shareholders be present. *See* Bylaws, Art. III ¶ 3. The

Bylaws also required that special meetings of the Board of Directors be called on at least two

days' notice to each director and established a majority of the directors in office would constitute

a quorum for the transaction of business. *See id.* Art. IV ¶¶ 6, 7.

 The relationship between the Brothers is, by all intents and purposes, a strained one that

was heavily impacted by their involvements with the Debtor. In July of 2017, Jim's

employment[5] with DVLT ended following a meeting among the Brothers, Douglas Maloney, a

lawyer representing Jim, and Barry Penn, a lawyer representing DVLT. Ex. 5, Jim's Decl., Mot.

to Dismiss, ECF 59 at 13 ¶ 25; DVLT's Resp. in Oppn. to Mot. to Dismiss, ECF 86 at 21–22 ¶

134. However, Jim's specific involvement with DVLT, and the reasons for his July 2017

termination are heavily disputed by the Brothers.

 On March 15, 2018, Jim initiated litigation in the United States District Court for the

Eastern District of Pennsylvania ("District Court") asserting, *inter alia*, claims for breach of

fiduciary duties and corporate waste ("District Court Litigation") against Jack personally, DVLT,

---

[3] The Shareholder's Agreement contains duplicative paragraphs numbered 26. The relevant paragraph is titled "Corporate Governance and Other Matters" and begins on page 15 of the Shareholder's Agreement and continues onto page 16. Unless otherwise specified, all references to page 16 and paragraph 26 of the Shareholder's Agreement shall refer to the paragraph identified in this footnote.

[4] Paragraph 26(c) in the Shareholder's Agreement also provided that, in the event that John was unavailable, either an individual named "Don Fork" would be responsible for resolving the disagreement, or the matter would proceed to arbitration as described in Paragraph 23 thereof.

[5] It is unclear from the record what Jim's exact position in DVLT was. Jim's position has been described by Jack as "Service and Rental Manager," while Jim has described his position more generally as a manager and co-owner. *See* DVLT's Resp. in Oppn. to Mot. to Dismiss, ECF 86 ¶ 2; Mot. to Dismiss, ECF 50 ¶¶ 34, 39. For purposes of this opinion, Jim's precise position in DVLT is irrelevant.

Jack's wife, and the Law Offices of Barry Penn, former counsel for DVLT ("Penn"). Second

Am. Compl. ("Jim's Complaint"), *Meyer et al v. Delaware Valley Lift Truck, Inc. et al*, No. 2:18-

cv-01118-WB (E.D. Pa. dismissed Dec. 2, 2021) ("Dist. Ct. Litig."), ECF 25 at ¶¶ 2–9, p. 20, 26,

29. Jim's Complaint in the District Court Litigation sought relief in the form of, *inter alia*, the

appointment of a custodian to effectuate the involuntary winding up and dissolution of DVLT for

Jack's alleged breaches of the Shareholder's Agreement, stemming from a number of alleged

acts performed by Jack, including but not limited to, improperly terminating Jim's employment

with DVLT, illegally seizing control of the company, and unfairly depriving Jim of his rights

under the Shareholder's Agreement. *Id.* at 12, 13, 20–26 ¶¶ 41–50, 70–84. As of the Petition

Date, pending before the District Court were cross-motions for summary judgment, the first of

which was filed by defendant Penn on October 6, 2020, and the second of which was filed by

Jim on October 7, 2020, seeking partial summary judgment.[6] Dist. Ct. Litig., ECF Nos. 100, 101,

& 102. Additionally, the parties to the District Court Litigation agreed by stipulation, confirmed

by order of the District Court on November 4, 2020, to extend the time Jim had to respond to the

oppositions of DVLT, Jack, and Penn to his partial summary judgment motion to November 18,

2020, and to extend the time for Penn to respond to Jim's opposition to his summary judgment

motion to November 20, 2020. Dist. Ct. Litig., ECF No. 109.

However, on November 10, 2020, only six days later, Jack, acting on behalf of DVLT,

filed and signed a voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy

Code for DVLT ("Petition"). Voluntary Pet. for Non-Individuals, ECF 1. Concurrently filed with

the Petition, and in support thereof, was a corporate resolution, dated November 10, 2020, and a

special meeting notice, dated October 26, 2020, which were both signed by Jack and purported to

---

[6] Also pending were defendants' Motions in Limine, to strike an Expert Report and Preclude Testimony of John E.
Mitchell, to which Jim had responded on October 20, 2020. Dist. Ct. Litig., ECF Nos. 97, 98, 99, & 105.

represent that the Debtor had convened a "meeting of the Shareholders and Directors" on November 6, 2020 beginning at 11:00 a.m., authorized the filing of the Petition, and resolved to enter into a stalking horse sale agreement with Best Line Leasing Inc. ("Best Line" or "Stalking Horse Bidder"). Corp. Resol. of DVLT, ECF 2. Thereafter, on November 13, 2020, a suggestion of bankruptcy was filed in the District Court, which resulted in the District Court Litigation being placed into suspense as to all defendants and the dismissal of all pending motions before the District Court on November 18, 2020. Dist. Ct. Litig., ECF Nos. 110, 111, 112.

As of the Petition Date, the Debtor was solvent, could pay its debts as they became due, and had roughly $4 million of net equity. Tr. of Video Conf. Op. of Ct. ("Tr. of Oral Op."), ECF 102 at 8:12–17. Nonetheless, on November 13, 2020, even before filing its schedules and other required documents, the Debtor filed, on an expedited basis, the "Debtor's Motion for Entry of an Order (A) Approving Bidding Procedures and Bidding Protections in Connection With the Proposed Sale of the Debtor's Assets, (B) Approving the Form and Manner of Notice; and (C) Granting Related Relief" ("Bid Procedures Motion")[7] contemplating the expedited marketing and consummation of Best Line's stalking horse bid for the purchase of substantially all the assets of the Debtor. Bid Proc. Mot., ECF 22 at 1–2.[8] The Bid Procedures Motion requested a November 25, 2020 deadline for obtaining expedited approval of the proposed bid procedures

---

[7] The Bid Procedures Motion was initially docketed incorrectly at ECF 15 on November 13, 2020. This error was later corrected on November 16, 2020, by docket entry ECF 22.

[8] The pagination of the Bid Procedures Motion, and exhibits thereto, warrants a brief explanation, to avoid confusion. The main document of the Bid Procedures Motion consists of pages 1–19 of ECF 22. The cover page of Exhibit 1 is located on page 20 of the main document but is then followed by Exhibit 2 of the Bid Procedures Motion on pages 21–25 of the main document. However, Exhibit 1 of the Bid Procedures Motion, defined *infra* as the APA, is a separately paginated document attached to ECF 22 with pages numbered 1–26. Therefore, all references to Exhibit 2 of the Bid Procedures Motion cite to pages 21–25 of the main document at ECF 22, and all references to Exhibit 1 of the Bid Procedures Motion cite to pages 1–26 of the separately uploaded exhibit to ECF 22.

(twelve days after the Bid Procedures Motion was filed), a Bid Qualification[9] Deadline of

December 18, 2020, and subsequent auction just ten days later (if applicable) on December 28,

2020, followed by an expedited Sale Hearing on December 30, 2020. *Id.* at 5 ¶ 15. Specifically,

Best Line's bid contemplated the purchase of certain DVLT assets, substantially in the form of

an attached draft Asset Purchase Agreement ("APA"),[10] dated October 17, 2020, for a contract

price of $1,750,000.00, inclusive of a $50,000.00 deposit, and exclusive of the DVLT accounts

receivable, contract rights, certain rental agreements defined in the Stalking Horse Bidder's

proposed asset purchase agreement, any claims arising under Chapter 5 of the Bankruptcy Code,

and DVLT's cash on hand. *Id.* at 6–7 ¶¶ 20, 21; Ex. 1, APA, Bid Proc. Mot., ECF 22. The APA

further contemplated, as a condition precedent to the sale, a consulting agreement by and

between Best Line and Jack to be executed concurrently with the APA ("Consulting

Agreement"), but the Bid Procedures Motion did not include the terms of that agreement. Ex. 1,

APA, Bid Proc. Mot., ECF 22 at 17 ¶ 10.4.

     On November 14, 2020, the UST unsurprisingly objected to the Bid Procedures Motion,

citing, *inter alia*, the Debtor's failure to file its schedules and other required bankruptcy

documents; questions concerning the relationship of the Stalking Horse Bidder to the Debtor;

concerns with respect to the Bid Procedures Motion being heard on an expedited basis; and

DVLT's solvency. UST's Obj. to Mot. to Expedite Hrg., ECF 17 at 2–3 ¶¶ 2–13. The next day,

---

[9] The terms of the Bid Procedures Motion required any interested parties to submit certain information, consisting of, *inter alia*, an affidavit detailing any connections with the Debtor or its insiders and a $50,000 deposit, at least ten days prior to the contemplated auction date of December 30, 2020, which constituted a mandatory "Bidder Qualification Package." Bid Proc. Mot., ECF 22 at 7–8 ¶ 23(c); Ex. 2, Bid Proc. Mot., ECF 22 at 21–22 ¶ 3.

[10] The Bid Procedures Motion described the DVLT assets to be sold, in terms defined in the attached draft of an APA between the Debtor and Best Line, as generally consisting of "without limitation, the Debtor's interest in new and used forklift, pallet truck, and material handling equipment, together with related parts and inventory; contract rights (including without limitation Debtor's interest in the Doosan Franchise Territory covering the Delaware Valley area), leases and rental agreements relating to the foregoing, (defined in the APA as the 'Material Contracts and Leases'); and intellectual property including the rights to and use of the name 'Delaware Valley Lift Truck,' all as more fully detailed in the APA." Bid Proc. Mot., ECF 22 at 6–7 ¶ 20.

on November 15, 2020, Jim filed his objection to the Bid Procedures Motion, echoing the UST's

concerns and raising additional allegations of bad faith and improper use of the bankruptcy

process to gain a tactical advantage in the District Court Litigation. Jim's Obj. to Mot. to

Expedite Hrg., ECF 20 at 2-5 ¶¶ 6–20.

Nonetheless, on November 16, 2020, the Court granted the Debtor's request for an

expedited hearing on the Bid Procedures Motion and scheduled the expedited hearing for

November 24, 2020. Ord. Granting Mot. to Expedite Hrg., ECF 24. Thereafter, on November 23,

2020, Jim filed a lengthy and detailed motion to dismiss the bankruptcy as a bad faith filing

pursuant to 11 U.S.C. § 1112(b) ("Dismissal Motion"), arguing that DVLT filed the Petition

without the requisite authority, in an effort to stop the District Court Litigation, to effectuate an

improper sale of the business, and to deprive Jim of the full benefit of his 50% share in the

company by negotiating a disguised sale price premised upon diverting a substantial portion of

the purchase price directly to Jack by way of a specially negotiated Consulting Agreement. Mot.

to Dismiss, ECF 50 at 3–4, 7–9, 12–40 ¶¶ 10–15, 43, 45, 61–184.

On November 24, 2020, the Court held an expedited hearing on the Bid Procedures

Motion ("Bid Procedures Hearing").[11] At the Bid Procedures Hearing, the Court was

unpersuaded by DVLT's push to move forward with an expedited sale and denied the Bid

Procedures Motion, because, by all interpretations, the Debtor was solvent and paying its bills as

they became due, its assets were not wasting away or rapidly diminishing in value, and the only

actual pressure to sell on an expedited timeline came from the consequences of consummating

the sale, which was the divestiture of Jim's claims in the District Court Litigation, which would

likely deprive Jim of the true value of his interest in DVLT. Tr. of Nov. 24, 2020 Bid Proc. Hrg.

---

[11] Transcribed at ECF 74.

("Bid Proc. Hrg."), ECF 74 at 8:13–20, 18:13–18. At the conclusion of the Bid Procedures

Hearing, the Court took notice of the pending Dismissal Motion and made its expectations of

Winterhalter explicit:

> [w]ith regard to the [Dismissal Motion], . . . which is going to be
> heard in mid-December, Mr. Winterhalter, you know, [Jim] has
> made these allegations about various meetings that were allegedly
> held and a quorum was there but . . . [Jim claims he] wasn't there
> so I'm not sure how there could be a quorum.
>
> You're an officer of the court and I know that you will be honest
> and forthcoming to me but I urge you between now and the
> hearing[] . . . to get to the bottom of those facts. I don't want to be
> in a situation . . . where we're not all on the same page about
> whether the debtor was authorized to file this bankruptcy . . . .
>
> You know [Jim is] saying that meetings weren't held . . . . I'm
> expecting you to get to the bottom of each of those allegations that
> [was] made and if, in fact, this is not an authorized filing, I'm
> going to expect a dismissal, okay?
>
> So assuming that you can get yourself comfortable with that and
> you can give me cold hard evidence that in fact there was
> authorization and. . . if the debtor is not insolvent, you know
> [Jim's] position is that you must get the consent of all the
> shareholders which means [Jim must] consent to the bankruptcy
> filings, to any kind of sale proceeding.

*Id.* at 9:19–20:22.

Thereafter, on December 16 & 17, 2020, the Court conducted a two-day evidentiary

hearing on the Dismissal Motion where the DVLT Directors, Daniel Bernheim, chief litigation

counsel for Jack in the District Court Litigation ("Mr. Bernheim"), Gary Green, litigation

counsel for Jim in the District Court Litigation ("Mr. Green"), and John Mitchell, an expert

witness retained by Jim in the District Court Litigation ("Mr. Mitchell"), each testified regarding

their involvement with events that transpired prior to the filing of the Petition ("December

Hearing").[12] At the conclusion of the December Hearing, the Dismissal Motion was granted, and

---

[12] Transcribed at ECF 109 & 110, respectively.

the Court's findings of fact and conclusions of law were issued orally ("Oral Opinion")

following the evidentiary hearing, and are incorporated herein by reference.[13]

 Based upon the testimony and other evidence presented at the December Hearing, the

Court made certain findings of fact in support of its determination that the Petition had been filed

in bad faith under 11 U.S.C. § 1112(b)[14] and without corporate authority, including, *inter alia*,

that:

> [o]n October 26th, 2020, a Notice of Special Meeting [of] Board of
> Directors and Notice of Shareholder [("Special Meeting Notice")]
> was issued by [Mr. Winterhalter]. . . . [It] was issued to Jack and
> Jim, Jim's attorney, Gary Green, . . . and some others. And when
> Mr. Green saw this[,] he objected to the meeting and required and
> requested that certain financial documents be provided before
> either of those two types of meetings could be convened.[15] In
> particular, he was concerned that before Jim would consider
> whether or not it was appropriate to have DVLT file a bankruptcy,
> he wanted to see some of the financial records.
>
> Although some documents were eventually provided, Mr. Green
> did not receive all of the financial documents that he needed to
> assist [Jim] in making a determination of whether a bankruptcy

---

[13] The Oral Opinion is transcribed at ECF 102.

[14] *See Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 160–62 (3d Cir. 1999) (outlining bases for dismissal for cause under 11 U.S.C. § 1112(b) in the Third Circuit Court of Appeals, including filing in bad faith).

[15] Specifically, with respect to the Special Meeting Notice, the relevant portions of Mr. Green's October 28, 2020, email to Winterhalter, which unequivocally conveyed Jim's unwillingness to establish a quorum for a shareholder/director's meeting, that was alluded to in the Oral Opinion, read:

> 3. There are many additional questions that must be answered before Jim can make a decision as a director and shareholder. For example, will there be a depressed purchase price and an enhanced rent paid to Jack for his building? What does Jack claim is owed to him? What would a pro forma distribution look like if the sale were consummated today? These and numerous questions make your proposed meeting not serious.
>
> 4. In short, it is not possible to vote on the proposed deal without having sufficient information to evaluate it.
>
> 5. Until there is complete transparency, and Jim is accorded the respect and opportunities to assess the value of the company, what he would get, and what Jack would get, he objects to the meetings. Moreover, he will not attend a shareholders' meeting on the same day as a directors meeting.
>
> 6. We will be following up with specific requests for disclosures, including a request to inspect the books as required by law. The last request we made prior the dissolution [sic] attempt, our request was first ignored and then rebuffed.

Ex. 11, Dec. Hrg., ECF 109.

should be filed. One of [Mr. Green's] partners, Larry Keller, [thereafter] reached out to DVLT separately to see if a global settlement could be reached, and if a fair price for Jim's share could be determined. Mr. Winterhalter then noticed a Microsoft Teams meeting invitation [for November 6, 2020 at 11:00 a.m.], the purpose of which was described as [Delaware Valley Lift Truck, Inc. – Negotiations/Evaluation on Sale of Business-Global Settlement ("Global Settlement Meeting")]. Mr. Green started the meeting, but unfortunately a global settlement was not reached at that time. Although Mr. Winterhalter asked Mr. Green if Jim would consent to a bankruptcy filing on multiple occasions, Mr. Green did not agree that that was appropriate, and it does not appear that any vote was ever taken.

The Court was concerned with the conflicting testimony that was provided by the Debtor and Mr. Burnheim [sic]. Various parties testified as to what happened…at the meeting, and the Court finds that . . . there was no properly noticed shareholder or board of director[s] meeting. Although there was an initial invitation by Mr. Winterhalter to convene such meetings, Mr. Green credibly testified that no such meeting could be held in the absence of certain financial documents. Accordingly, Mr. Winterhalter sent out the Microsoft Teams invitation which confirmed Mr. Green's description of the meeting as simply a global settlement meeting… [T]here was no notice[;] there was no valid board of directors meeting[; and] there was no shareholder meeting[; therefore,] that meeting was never held.

Furthermore, the Court was very concerned with Mr. Burnheim's [sic] testimony, which basically backed up Mr. Green's testimony and Mr. Mitchell's testimony that the meeting began shortly after 11 o'clock on November 6th, 2020, that Mr. Green ran the meeting[,] trying to see if they could reach a [global] resolution. When no resolution could be met, [Mr. Green] ended the meeting. Mr. Mitchell, Mr. Green and Jim Meyer then left the meeting. And Mr. Burnheim [sic] said that nothing substantive happened after that. I found the testimony of John and Jack Meyer to be self serving [sic] in this matter just to tell the Court that a vote was apparently later taken. [The Debtor's] own witness contradicted that very finding, and [Mr. Bernheim] clearly said . . . not only did nothing else happen, but everyone testified that there was no vote taken. . . . [T]here was no board of directors meeting, there was no shareholder meeting, there was no vote, and it appears to the Court that Jack and John were lying when they said that there was some

meeting afterwards where a vote was taken. . . . [A]fter the parties left, Mr. Mitchell and Jim Meyer and Mr. Green, after they left, that was it. And then they had to basically recreate events in order to justify this bankruptcy filing.

So[,] for all of those reasons, the Court is going to dismiss the case[,] because this bankruptcy has not been properly authorized. Furthermore, the Court finds that this case was in fact filed in bad faith and [the following are] the highlights of the remaining facts that are relevant to that determination.

. . . On November 13th, 2020, DVLT filed [the Bid Procedures Motion] seeking to establish bidding procedures and [effectuate] the sale of DVLT assets to Best Line. DVLT requested an expedited hearing [shortly] before Thanksgiving and [contemplated] a sale scheduled for before the end of the year. Best Line offered to pay $1.75 million for DVLT's assets. DVLT later filed schedules showing that[,] after liabilities were subtracted from DVLT's assets, $4 million of net equity remained. Furthermore, DVLT does not appear to be meaningfully delinquent on any of its debts. On numerous occasions DVLT explained that it needed to file bankruptcy in order to stop the growing legal fees incurred in connection with the District Court [Litigation]. The Court was troubled today to hear that the legal fees of Jack Meyer are apparently being paid by the Debtor. . . . [E]ven though [Jack is] a defendant in [the District Court Litigation] and is being represented by Mr. Burnheim [sic], he's allowing DVLT to front all of his legal bills.

. . .

. . . [Upon consideration of] the factors under SGL[,] . . . [first,] this is clearly a two-party dispute between DVLT and Jim Meyer. Second, the Debtor admits that it is able to pay its debts as they become due and is solvent. Its own schedules show that there's $4 million of net equity, notwithstanding the self-serving testimony that we heard today by Jack Meyer[, in an effort to recharacterize the schedules and] decrease the amount of equity. . . . [T]he schedules are perfectly reliable. . . . [Moreover,] Jack Meyer was not credible in testifying to any kind of lesser amount of net equity in the company. The filing of this bankruptcy to conduct a sale to stop the [District Court Litigation] and to stop Jim from, as [Jack] testified . . . today, to stop Jim from complaining about the payment of his shares to his parents. [T]he Debtor says that this [case] was filed because [DVLT was] facing very high legal fees in

connection with the District Court Litigation. My first response to that is, well, part of those fees were incurred on behalf of Jack, so perhaps [DVLT] should have been letting Jack . . . pay for his own fees. Then they say that [the Petition] was filed in order to conduct a sale. And I just — I can't help but find the timing of the bankruptcy, you know, right around the time when the summary judgment motion was about to be heard and the ridiculously expeditious schedule for the sale. I mean, you know, this wasn't a Debtor trying to act in the best interest of its creditors or its shareholders, it was trying to schedule a lightning-fast sale which would have certainly chilled any kind of bidding by other interested parties. For that reason alone, I don't think that the Debtor was acting in its creditors' and shareholders' best interest[s]. If they truly were trying to get the best price for the equity holders and were willing . . . to open [the bidding] up to anyone, by having the [Bid Procedures Motion] heard on the eve of Thanksgiving[,] and to propose a closing by the end of the year[,] would certainly not allow the best or highest price for this debtor to come in to benefit everybody. . . . [T]he fact that there was no asset purchase agreement, the fact that we haven't seen anything since then belies what the Debtor argues and has testified to today [at the December Hearing], which is that [DVLT and Jack] wanted to have a sale.

I can only conclude, based upon all of the evidence [I've seen], [and] testimony that I've [heard] today, that the sale was cooked up by Jack in order to stop the [District Court Litigation]. . . . [B]ased upon everything I've seen [and heard], I believe that Jack thought that by filing a bankruptcy petition in favor of DVLT, that that would stop the litigation against all of the defendants [in the District Court Litigation].

Furthermore, based upon the ridiculous expeditious filing of the motion to sell, I further find that not only did [Jack and his lawyers] want to stop that litigation from going forward, but they also thought that by having the sale motion heard on an expeditious basis, that they would then come up with an offer that was far less than the true value of the company, so as to deprive Jim Meyer the benefit of his 50% share in the company. That's what I must conclude based upon everything I've heard today. They simply were trying to stop the litigation, pay [Jim] off at a decreased amount, and just make everything go away. . . . Jack was going to get a lucrative deal with Best Line and was guaranteed $750,000 worth of payments [under a specially negotiated Consulting Agreement], which certainly doesn't seem like an

arms' length transaction. . . . [T]hat was part of the disguised sale
price meant to go into the hands of Jack Meyer and not to give Jim
Meyer the benefit of that [portion of the purchase price] at all.

Furthermore, going through the remaining factors in SGL, the
Court finds that the Debtor had minimal unsecure debt; it was not
delinquent on any of that debt. I also find that this filing was done
in order to evade [District] Court orders, . . . [to prevent the]
District Court [from proceeding] with its summary judgment
hearing after Jim was to file his reply. There are obviously very
few debts. You never see . . . schedules like we saw in this case, . .
. where there's $5 million of assets and less than a million dollars
of liabilities. . . . When you see that, you know, it's a clear sign
that this Debtor is in fact solvent. [The Petition] was done to stop
the summary judgment hearing, not a foreclosure, necessarily. . . .
[T]he Debtor obviously had sufficient funds to continue operating.
There was no pressure from any other creditors, it was just [the
cost of Jim's] litigation against the Debtor[, Jack and others]. And
I also find that this case was filed solely to create the automatic
stay, perhaps with the mistake in understanding that it would stop
the litigation against all the Defendants.

Tr. of Oral Op., ECF 102 at 4:9–11:21.

On that basis, the Court dismissed the bankruptcy and retained jurisdiction for thirty (30) days to

consider any motions for sanctions. *Id.* at 11:22–12:1.

On January 14, 2021, the UST filed his motion seeking sanctions against Winterhalter

under Rule 9011 and 11 U.S.C. § 105(a) ("UST Motion"). UST's Mot. for Sanctions, ECF 105.

The same day, Jim's Motion (collectively with the UST Motion, "Sanctions Motions") was filed

seeking sanctions jointly and severally against Winterhalter, Offit Kurman, and Jack under Rule

9011, the Court's inherent power, and 11 U.S.C. § 105(a), in addition to seeking sanctions jointly

and severally against Offit Kurman and Winterhalter under 28 U.S.C. § 1927. Mot. of James E.

Meyer for Entry of a J. Ord. Imposing Sanctions against (I) Offit Kurman, P.C., (II) Paul J.

Winterhalter, Esq, and (III) John W. Meyer ("Jim's Mot. for Sanctions"), ECF 107. On February

18, 2021, the Court entered an order providing that the hearings on each of the Sanctions

Motions would be consolidated into one proceeding before the Court. Ord. Auth. Consol. of Separate Sanctions Mot. for Hrg. and Disposition, ECF 133.

On May 19, 2021, the court held an evidentiary hearing on the Sanctions Motions ("Sanction Hearing")[16] where Winterhalter testified with respect to his conduct and involvement with the filing of the Petition. At the Sanction Hearing, Winterhalter was afforded wide leeway when testifying with respect to his knowledge and actions during the events leading up to and in furtherance of filing the Petition and Bid Procedures Motion, and the following facts were established by his testimony.

Winterhalter first became aware of DVLT and the District Court Litigation in approximately February 2020 after being contacted by Herbert Fineberg ("Fineberg"), his law partner at Offit Kurman who at the time represented DVLT in the District Court Litigation, to consult on certain matters, at which time Winterhalter first read Jim's Complaint.[17] Sanction Hrg. Tr., ECF 170 at 57:1-20, 76:7–15. However, Winterhalter was not retained to represent DVLT in any legal matter at that time. Thereafter, in June 2020, Winterhalter first met with Jack at the Offit Kurman office located in Plymouth Meeting, Pennsylvania, because Fineburg requested to consult with Winterhalter about whether a company could be sold in bankruptcy when there was a shareholder dispute. Id. at 57:16–58:12, 74:10-19. Winterhalter was formally retained by Jack when the latter signed an engagement letter, dated July 7, 2020, to represent DVLT for the "purposes of avoiding unnecessary continued litigation expenses [in the District Court Litigation] and effectuating a controlled sale of the business." Id. at 58:14–59:25.

---

[16] Transcribed at ECF 170.
[17] It is unclear from the record precisely what Winterhalter was consulted about in February 2020, but for the purposes of this opinion, the only relevant detail was that Winterhalter first read Jim's Complaint and became familiar with the District Court Litigation in February 2020.

After the initial meeting in June 2020 and through the Petition Date, Winterhalter had multiple conversations with Jack, both in person and electronically, with respect to the proposed sale of DVLT, contemplation of a potential bankruptcy filing, and the issues that surrounded those matters, such as the relevant history between the Brothers, the status of the District Court Litigation, the overall financial condition of DVLT, and the terms of the proposed bid by Best Line. *Id.* at 58:5-12, 60:3-9, 61:19-62:8, 77:20-78:21, 89:15–96:24. Prior to the Petition Date, Winterhalter reviewed both the Bylaws and the Shareholder's Agreement, the latter of which contained certain provisions, described *supra,* for resolving deadlocks over major decisions between the Brothers. *Id.* at 82:18–83:4.

Winterhalter was also involved prepetition with drafting the negotiated APA between DVLT and Best Line, which included reference to the condition that Jack would receive at least $750,000.00 under the terms of the Consulting Agreement, but Winterhalter was not involved with proposing or negotiating that specific provision. *Id.* at 83:5–11, 187:7-188:2, 195:12-22. In fact, Winterhalter advised Jack that the Consulting Agreement with Best Line would likely be met with heavy scrutiny if presented as a part of the APA in a bankruptcy. *Id.* at 187:7-25, 193:24–194:8. Finally, Winterhalter knew that, despite a vote to dissolve the Debtor that took place at a shareholder's meeting on June 22, 2020, a further meeting was necessary to conduct a proper vote to authorize the filing of the Petition. *Id.* at 103:7–21, 110:3–14; *See* Winterhalter's Ex. 25, Sanctions Hrg.

Following the Sanction Hearing, the parties completed a round of supplemental briefing. On August 18, 2021, at a status conference on the Sanctions Motions,[18] the Court announced its ruling in favor of imposing joint and several liability for monetary sanctions on Winterhalter and

---

[18] Transcribed at ECF 179.

Offit Kurman under Rule 9011, and against Winterhalter individually under 11 U.S.C. § 105(a)

and 28 U.S.C. § 1927. Tr. of Aug. 18, 2021 Hrg. on Sanctions Motions, ECF 179 at 4:9–22. The

Court then requested another round of briefing focused solely on the reasonableness of monetary

sanctions. *Id.* at 4:23–5:1. Briefing was completed on November 19, 2021, and a status hearing

was held on December 13, 2021, with respect to the reasonableness of monetary sanctions ("Fee

Hearing"). *See* ECF 182, 183.

The UST does not propose any specific monetary amount, or other form of sanction, but

briefed cases it considers relevant and defers to the Court's discretion to craft a sanction that

serves the underlying purpose of Rule 9011, to deter the same future conduct by Winterhalter

and those similarly situated. *See generally* UST's Mot. for Sanctions, ECF 105; Mem. in Lieu of

Br. in Supp. of Nature of Sanctions to be Imposed Against Winterhalter, ECF 178. Jim, however,

believes that the circumstances of this case warrant a fee-shifting sanction against Winterhalter

and his firm, Offit Kurman, to best deter them and others similarly situated from engaging in the

same or similar conduct in the future. Jim's Mot. for Sanctions, ECF 107 at 4 ¶ 9; Jim's Br. in

Supp. of an Award of Atty. Fees and Costs as Sanctions against Offit Kurman and Winterhalter

("Jim's Fee Br."), ECF 177 at 5–10.

In support of his position, Jim submitted a detailed accounting of the fees and costs

incurred[19] as a result of the filing of the Petition and requests an award for the full amount,

consisting of $272,459.00 in total fees, and $5,666.87 in total costs and expenses, for a total

monetary sanction of $278,125.87. *See* Ex. A, B, & C, *id.*, ECF 177-1, 177-2, & 177-3. Of this

---

[19] In Jim's brief in support of sanctions, KPC's time records are split into two time periods, the earlier being the time from the Petition Date through the date of dismissal (November 11, 2020 – January 13, 2021), and the latter being the time following the dismissal of the case (January 14, 2021 – September 21, 2021); whereas SPG's time records cover only the period of November 11, 2020 – December 17, 2020. Jim's Fee Br., ECF 177 at 10. Even though Jim's brief respecting the reasonableness of fees requested indicates the relevant time period of SPG is "through and including December 17, 2021," the time records of SPG submitted in support of the requested sanctions award only cover services provided up to December 17, 2020. Ex. C, Jim's Fee Br., ECF 177-3.

amount, $168,274.00 in total fees and $5,666.87 in total costs are attributable to work performed

by Karalis P.C. ("KPC"), the firm representing Jim in the bankruptcy proceedings, and

$104,185.00 in total fees are attributable to work performed by Sidkoff, Pincus, & Green P.C.

("SPG"), the firm representing Jim in the District Court Litigation.[20] *Id.*, ECF 177 at 10. Jim

further contends Winterhalter and Offit Kurman should be held jointly and severally liable for

any sanction awarding Jim reasonable attorney's fees. Jim's Mot. for Sanctions, ECF 107 at 8 ¶¶

34–5.

     Winterhalter contends that a fee-shifting award is an inappropriate sanction in this

instance because it "rewards one party in a contentious and complex case based seemingly on the

unexpected and unusual testimony of DVLT's witnesses" and, while the rates and work

submitted by KPC are reasonable, the involvement of SPG in the bankruptcy case was entirely

unnecessary. Winterhalter's Br. in Opp. to Sanctions ("Winterhalter's Fee Br."), ECF 180 at 3–4.

Moreover, Winterhalter argues that fee-shifting should not be imposed for SPG's representation

in the District Court Litigation; the rates charged by SPG "greatly exceed" those of bankruptcy

counsel; no compensation should be provided for Mr. Green's time spent as a witness during the

December Hearing; and a monetary sanction imposing the full amount of fees incurred would be

punitive in nature. *Id.* at 4.[21] Lastly, Winterhalter argues that factors such as damage to his

reputation resulting from the bad faith Petition, loss of goodwill with this Court, and a permanent

wedge driven between Offit Kurman and its client serve as adequate deterrents in lieu of a fee-

---

[20] It should be noted that the Declaration of Gary Green, attached as Exhibit C to Jim's brief in support of an award of attorney's fees and costs as a sanction, claims that SPG was also retained to represent Jim in the bankruptcy proceeding. Ex. C, Jim's Fee Br., ECF 177-3 at 2 ¶ 4.
[21] Winterhalter verbally raised the argument that any fee-shifting of SPG's fees would be purely punitive in nature at the Fee Hearing.

shifting award. *Id.* at 13–14. In light of the foregoing facts, the following constitutes the Court's

findings of fact and conclusions of law in support of monetary sanctions.

## III.    DISCUSSION

The Court will now, referencing applicable legal principles, elaborate on its conclusion

that sanctions are warranted against Winterhalter and Offit Kurman, and determine the

reasonable amount of sanctions to impose. Ultimately, the Court agrees with the UST and Jim

that sanctions against Winterhalter are justified under Rule 9011, 11 U.S.C. § 105(a), and 28

U.S.C. § 1927 because Winterhalter abused the bankruptcy process by orchestrating the filing of

the Petition for an improper purpose, merely to advance the interests of Jack and to disrupt the

District Court Litigation, and in doing so relied upon objectively unreasonable factual

contentions. UST's Mot. for Sanctions, ECF 105 at 7 ¶ 31, 9 ¶ 36; Jim's Mot. for Sanctions, ECF

107 at 11–12 ¶¶ 47–52. However, the Court declines to impose sanctions against Jack.

Accordingly, for the reasons stated below, the Court exercises its discretion to impose monetary

sanctions, jointly and severally, on Winterhalter and Offit Kurman for $204,183.57 in counsel

fees and costs incurred by Jim in connection with this bad faith bankruptcy filing. Additionally,

Winterhalter is personally liable in the amount of $9,757.30 for counsel fees and costs incurred

by Jim because of Winterhalter's bad faith misconduct, which unreasonably and vexatiously

multiplied proceedings.

### A.    Rule 9011

Pursuant to Rule 9011(b):

> [b]y presenting to the court (whether by signing, filing, submitting,
> or later advocating) a petition, pleading, written motion, or other
> paper, an attorney or unrepresented party is certifying that to the
> best of the person's knowledge, information, and belief, formed
> after an inquiry reasonable under the circumstances, – (1) it is not
> being presented for any improper purpose, such as to harass or to
> cause unnecessary delay or needless increase in the cost of

litigation…[and] (3) the allegations and other factual contentions
have evidentiary support or, if specifically so identified, are likely
to have evidentiary support after a reasonable opportunity for
further investigation or discovery…

Fed. R. Bankr. P. 9011(b). Under Rule 9011(c), "[i]f, after notice and a reasonable opportunity to

respond, the court determines that subdivision (b) has been violated, the court may, subject to the

conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties

that have violated subdivision (b) or are responsible for the violation." Fed. R. Bankr. P. 9011(c).

"When imposing sanctions, the court shall describe the conduct determined to constitute a

violation of this rule and explain the basis for the sanction imposed." Fed. R. Bankr. P.

9011(c)(3).

Courts must evaluate whether Rule 9011(b) has been violated under an objective

standard. *In re Taylor*, 655 F.3d 274, 282 (3d Cir. 2011) ("The imposition of Rule 11

sanctions…requires only a showing of objectively unreasonable conduct."). As such, the "pure

heart, empty head" or subjective good faith defense is inapplicable. *See Lieb v. Topstone

Industries, Inc.*, 788 F.2d 151, 157 (3d Cir. 1986). To assess a Rule 9011 violation, the court

need not use the benefit of hindsight but should instead inquire whether what the signer believed

at the time the filing was submitted was "reasonable under the circumstances." *Ettinger &

Assocs. LLC v. Miller (In re Miller),* 529 B.R. 73, 90 (Bankr. E.D. Pa. 2015).

With respect to Rule 9011(b)(3), which imposes a duty on attorneys or unrepresented

parties to ensure, upon reasonable investigation, that "the factual contentions they submit to the

court have (or are likely to have) evidentiary support," the Third Circuit Court of Appeals

("Third Circuit") has directed courts to focus on "whether the party making the representation

reasonably believed it at the time to have evidentiary support" when determining whether a party

violated that provision. *In re Thomas*, 612 B.R. 46, 61 (Bankr. E.D. Pa. 2020) (quoting *In re

*Taylor*, 655 F.3d at 282). To be reasonable, the signer must have had "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." *In re Taylor*, 655 F.3d at 284.

The requirements of Rule 9011 not only apply to the time papers are signed, filed, or submitted to the court, but also to "later advocating" certain representations to the court. Fed. R. Bankr. P. 9011(b). Continuing to represent a position to the court "after learning that the position no longer has merit" violates Rule 9011(b). *See In re Coquico, Inc.*, 508 B.R. 929, 940 (Bankr. E.D. Pa. 2014) (quoting *Theokary v. Abbatiello (In re Theokary)*, 468 B.R. 729, 746 (Bankr. E.D. Pa. 2012) *aff'd*, 2013 U.S. Dist. LEXIS 155413, 2013 WL 5823849 (E.D. Pa. Oct. 29, 2013)). Parties have a "continuing responsibility to review and reevaluate pleadings and modify them when it is appropriate." *In re Jazz Photo Corp.*, 312 B.R. 524, 536 (Bankr. D.N.J. 2004) (citing *Timmons v. Cassell (In re Cassell)*, 254 B.R. 687, 691 (B.A.P. 6th Cir. 2000)). If a party "learns, or has reason to learn, that he will not be able to offer evidence sufficient to sustain his burden," Rule 9011 requires a party to act—up to dismissing a cause of action. *See id.* (quoting *Halverson v. Funaro (In re Funaro)*, 263 B.R. 892, 903–04 (B.A.P. 8th Cir. 2001)).

> ### i.    Sanctions Under Rule 9011 are Warranted Against Winterhalter for Winterhalter's Participation in Furtherance of the Bad Faith Filing of the Petition and Assertion of Representations in Support of the Petition Which Lacked Evidentiary Support.

The Court concludes that Winterhalter violated Rule 9011(b)(1) by orchestrating the baseless filing of the Petition under circumstances where it was patently obvious proper corporate authority had not been obtained for the improper purpose of derailing the District Court Litigation to gain an advantage for Jack in a two-party dispute by attempting to facilitate a sale of a solvent company in such a way as to deprive Jim of the true value of his equity interest in DVLT. These do not constitute valid bankruptcy purposes. *See e.g., 15375 Memorial Corp. v.*

*BEPCO, LP (In re 15375 Memorial Corp.),* 589 F.3d 605, 619 (3d Cir. 2009); *Official Comm. of Unsecured Creditors v. Nucor Corp., (In re SGL Carbon Corp.),* 200 F.3d 154, 165 (3d Cir. 1999).

The Court has already determined that the Petition was filed in bad faith rather than to pursue legitimate bankruptcy purposes for the reasons stated in the Oral Opinion. Furthermore, the circumstances reflect that Winterhalter specifically advised bankruptcy as a strategy when he knew that the company was embroiled in a two-party dispute between 50% shareholders, had over $4 million in equity as of the Petition Date, was solvent—owing no significant debts aside from Jim's potential claims arising from the District Court Litigation—and able to pay its debts as they became due. The timing and purpose of the Petition was to pursue an expedited sale process, which would obviously chill any opportunity for competitive bidding and by design would have resulted in the company being sold for significantly less than the $4 million of equity reflected in the schedules, thus enabling Jack to circumvent the District Court Litigation, particularly Jim's pending summary judgment motion, and secure for himself a $750,000.00 portion of the negotiated Best Line purchase price through a Consulting Agreement that was a precondition of the proposed sale to Best Line. Under those circumstances, no objectively reasonable attorney could have found that a bankruptcy would serve any legitimate purpose. The Petition was clearly only contemplated for the purpose of avoiding potential summary judgment in the District Court Litigation while attempting to secure a $750,000.00 guaranteed payment for

Jack.[22] Therefore, Winterhalter must be held liable under Rule 9011(b)(1) as the party responsible for the violation.[23]

The Court further concludes that Winterhalter violated Rule 9011(b)(3) by filing the corporate resolution containing representations lacking sufficient evidentiary support and later advocating certain representations in support of the Petition which lacked sufficient evidentiary support, specifically, that a meeting of the shareholders/directors was properly noticed and convened pursuant to the Bylaws and that DVLT corporate authorization to file the Petition was properly given. *See* ECF 2; Dec. Hrg. Tr., ECF 110 at 237:8–239:12. As this Court already concluded in the Oral Opinion, the circumstances for obtaining the corporate authority to file the Petition clearly never came to pass. The only evidence offered in support of the representation that corporate authority was properly obtained relied upon the Special Meeting Notice that was formally objected to by Mr. Green and the vague testimony by John and Jack that a vote was apparently taken after Jim and others left the Global Settlement Meeting.

With respect to the Special Meeting Notice, prior to filing the Petition, Winterhalter understood what corporate formalities were in place under the Bylaws and Shareholders Agreement, and he knew the details of those provisions in the Shareholder's Agreement governing "major decisions," such as that they were to be made by unanimous consent of the shareholders, that in the event of an impasse, John would serve as the tiebreaking vote, and that corporate authority could only be obtained to file a bankruptcy petition without Jim's consent if certain meetings and votes were properly conducted. Winterhalter had attempted to convene a

---

[22] In fact, even though Winterhalter did not personally negotiate the terms of the Consulting Agreement between Jack and Best Line, he clearly recognized, and advised, that the Consulting Agreement would be problematic if presented in a bankruptcy case, but he nevertheless still improperly facilitated the use of the bankruptcy system in order to promote it in furtherance of the improper purposes described *supra.*

[23] Because the Rule 9011 violation was facilitating the filing of the Petition for an improper purpose, the safe harbor rule does not apply. *See* Rule 9011(c)(1)(A) (the 21-day safe harbor "limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b).").

meeting to take a vote by issuing the Special Meeting Notice. However, as stated in the Oral

Opinion, the Special Meeting Notice was immediately objected to by Mr. Green, who made

requests for certain documents that were never provided, and who made clear to Winterhalter

that an informed meeting of the directors or shareholders could not be held until such

information was provided.[24] Thereafter, Mr. Keller separately contacted Winterhalter to enter

discussions regarding a potential global settlement between the Brothers. Winterhalter's own

description of the Global Settlement Meeting in the Microsoft Teams invitation he sent to the

relevant parties was titled "Delaware Valley Lift Truck, Inc. – Negotiations/Evaluation on Sale

of Business-Global Settlement," reflecting his awareness that the purpose of the meeting was to

discuss a global settlement. Dec. Hrg. Tr., ECF 109 at 55:11–16. The Global Settlement

Meeting, which Winterhalter attended, only involved global settlement discussions between the

Brothers, and no vote to authorize the filing of a bankruptcy petition on behalf of DVLT ever

occurred, which Winterhalter would have known as a participant in that meeting.

 With respect to John and Jack's self-serving testimony that a vote was apparently taken

after Jim and others left the Global Settlement Meeting, such claims were clearly refuted by Mr.

Bernheim, DVLT's own witness.[25] As determined by the Oral Opinion, no valid board of

directors or shareholders meetings ever happened, and no vote overriding Jim's clear position

against the filing of the Petition was ever validly taken. John and Jack's testimony appears to

have been manufactured in opposition to the Dismissal Motion. Given Winterhalter's intimate

---

[24] The Court makes no determination as to whether the underlying facts and circumstances are consistent with any applicable provisions of the Pennsylvania Business Corporation Law, but merely acknowledges that the evidence presented indicates that discussion of and intention to hold the meeting described in the Special Meeting Notice effectively ceased once Mr. Green's demand for information went unfulfilled and Winterhalter subsequently failed to pursue the scheduling of such meeting.

[25] Another factor weighing heavily against Jack's credibility as a witness was his conflicting testimony that he did not investigate any sale of DVLT until after Jim and he had agreed to dissolve DVLT in June 2020. Dec. Hrg. Tr., ECF 110 at 126:14–24. He entirely contradicted that assertion when admitting to entering into discussions with Best Line as early as April or May of 2020. *Id.*, ECF 110 at 204:24–205:4.

involvement with DVLT's attempt to obtain Jim's consent to file the Petition, or otherwise obtain corporate authority, and his knowledge of the requirements under the Bylaws and Shareholder's Agreement, the testimony from John and Jack, again, completely contradicted by Mr. Bernheim, could not have given a reasonable attorney in Winterhalter's position any basis to believe that there was any bona fide evidentiary support for the representation that corporate authority had been obtained to file the Petition.

Based on the foregoing, Winterhalter violated Rule 9011(b)(1) and (b)(3) by presenting the Petition for an improper purpose based upon contentions which lacked reasonable evidentiary support.[26]

### ii.    Sanctions Against Jack Are Not Warranted Under Rule 9011.

Although unrepresented signatories to a bankruptcy petition, such as Jack, may be sanctioned under Rule 9011(c) if responsible for a Rule 9011(b) violation, in this case, the Court simply has not been presented with evidence demonstrating that Jack was the driving force responsible for the improper legal strategies employed in this case, *i.e.*, having DVLT pursue an unauthorized, meritless bankruptcy for improper purposes in violation of Rule 9011(b)(1). *See Project 74 Allentown, Inc. v. Frost,* 143 F.R.D. 77, 83 (E.D. Pa. 1992); *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A. (In re Nat'l Medical Imaging Co.),* 570 B.R. 147, 164-65 (Bankr. E.D. Pa. 2017); *In re Coquico, Inc.,* 508 B.R. at 937 ("All signatories to a bankruptcy petition, including Bankruptcy counsel and a debtor's officer or representative, subject themselves to Bankruptcy Rule 9011."). No evidence was produced reflecting Jack's involvement with the formulation and execution of the bankruptcy strategy, that he misled Winterhalter into believing bankruptcy would be an appropriate strategy, or that he knew or should have reasonably known the purposes

---

[26] No sanctions under Rule 9011 shall be imposed for the filing of the Bid Procedures Motion, because the 21-day safe harbor provision of Rule 9011 was not met.

for which the Petition was filed were improper. In fact, when asked at the Dismissal Hearing
"[w]hose idea was it to use bankruptcy to effectuate the sale" Jack responded, "I think Paul
[Winterhalter] introduced that to me." Dec. Hrg. Tr., ECF 110 at 158:24-159:3. Ultimately,
sanctions cannot be entered against the signer of an offending document unless the signer had a
meaningful role in the decision-making process which led up to the signature. *In re Singer
Furniture Acquisition Corp.*, 261 B.R. 745, 749 (M.D. Fla. 2001). As far as the Court can tell,
Jack's actions as a principal of DVLT appear to have been taken merely under the direction of
counsel. Accordingly, the Court cannot find that Jack was the party *responsible* for pursuing
bankruptcy for an improper purpose in violation of Rule 9011(b)(1).

Furthermore, with respect to Rule 9011(b)(1), the Court does not have a basis to conclude
on the record before it that an objectively reasonable person in Jack's position - that of a
layperson running a small, closely held family business - would have understood that utilizing
the bankruptcy system to pursue certain goals in the District Court Litigation and the sale of a
solvent company was improper despite bankruptcy counsel holding the opposite position. The
Court has been provided with no reason why a layperson in Jack's position should have
reasonably questioned his counsel's judgment and understood that pursuing bankruptcy for the
purposes that he did was not proper or in violation of Rule 9011(b)(1).

With respect to Rule 9011(b)(3), Jack signed the corporate resolution which represented
that a shareholders and directors meeting had occurred on November 6, 2020 pursuant to the
Special Meeting Notice and that DVLT had authorized the bankruptcy pursuant to a two to one
vote. He later testified at the Dismissal Hearing that immediately after the Global Settlement
Meeting ended, a directors and shareholders meeting occurred where a vote was taken to
authorize the bankruptcy. Despite these problematic representations, the record was not

sufficiently developed respecting what Jack, again, a layperson, precisely understood the terms

of art he used in his testimony and in the corporate resolution to mean. In fact, Jack's testimony

at the Dismissal Hearing shows his lack of familiarity with certain legal terms he uses which he

likely picked up from counsel. For instance, he testified at the Dismissal Hearing that he had

wanted to accomplish a "363 sale" with Best Line, but when asked to explain his understanding

of how a "363 sale" protects the buyer, he testified "I'm not really sure." Dec. Hrg. Tr., ECF 110

at 134:22-135:5. It is fair to conclude that while Jack may use certain terms that he has heard his

counsel use, he may not possess a true understanding of their significance. Furthermore, the

record does not reflect that he otherwise understood the deficiencies in the Special Meeting

Notice.

While the Court concluded in its Oral Opinion that no valid shareholders or directors

meeting occurred and that no vote was taken, that does not necessarily preclude there having

been some discussion among Jack, John, and Winterhalter after Jim's team departed the Global

Settlement Meeting respecting whether in light of the failed settlement attempt and Jim's

opposition to the Best Line sale and bankruptcy, they still wished to pursue the bankruptcy in

some manner. An objectively reasonable layperson in Jack's position could have misinterpreted

the significance of that discussion, particularly in light of his counsel's position that that

discussion constituted a shareholders and directors meeting where a valid vote occurred, giving

him an objectively reasonable basis to believe the accuracy of the corporate resolution and truth

of his testimony respecting the occurrence of a shareholders and directors meeting and taking of

a vote for purposes of Rule 9011(b)(3). Neither the Dismissal Hearing nor the Sanction Hearing

explored why Jack made the statements he did respecting DVLT authorizing the bankruptcy

filing, why he used the terms he did in his testimony, or why he believed it was appropriate to

sign the corporate resolution, such that the Court has any basis to conclude a reasonable

layperson with Jack's level of knowledge and understanding should have known that no valid

vote was taken and thus that the bankruptcy was not authorized.[27] Therefore, it would not be

appropriate to sanction Jack based on Rule 9011(b)(3) either.

### iii.    Offit Kurman Is Jointly and Severally Liable with Winterhalter Pursuant to Rule 9011(c)(1)(A).

Rule 9011(c)(1)(A) expressly states "[a]bsent exceptional circumstances, a law firm shall

be held jointly responsible for violations committed by its partners, associates, and employees."

Offit Kurman has not brought to the Court's attention any exceptional circumstances which

would make it appropriate to disregard Rule 9011(c)(1)(A)'s plain language respecting joint law

firm liability for Rule 9011 violations of its partners, associates, and employees. Therefore,

pursuant to the unambiguous language of Rule 9011(c)(1)(A), because Winterhalter has been

found responsible for violating Rule 9011, Offit Kurman shall be held jointly and severally liable

for sanctions imposed under Rule 9011.

### B.    11 U.S.C. § 105(a) and 28 U.S.C. § 1927.

Bankruptcy courts, like other federal courts, have inherent powers to impose sanctions for

improper conduct that is abusive to the judicial system. *See, e.g.*, *Fellheimer, Eichen &*

*Braverman, P.C. v. Charter Tech., Inc.*, 57 F.3d 1215, 1224 (3d Cir.1995) ("The imposition of

sanctions . . . transcends a court's equitable power concerning relations between the parties and

reaches a court's inherent power to police itself . . . .") (quoting *Chambers v. NASCO, Inc.*, 501

U.S. 32, 45–46, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27, 45–46 (1991)); *In re Dyer*, 322 F.3d

---

[27] As discussed *supra,* the Court commented in the Oral Opinion that it did not find Jack's testimony credible and that it appeared that he may have lied when he gave his testimony respecting the vote and shareholders/directors meeting. That the Court did not find his testimony particularly credible simply is not the test for whether sanctions should be awarded against Jack in the absence of a more developed record.

1178, 1196 (9th Cir.2003) ("The inherent sanction authority allows a bankruptcy court to deter

and provide compensation for a broad range of improper litigation tactics."); *In re Rimsat, Ltd.,*

212 F.3d 1039, 1049 (7th Cir. 2000) (a bankruptcy court is "not required to apply available

statutes and procedural rules in a piecemeal fashion where only a broader source of authority is

adequate to justify all the necessary sanctions."); *In re Antonelli,* No. 11-20255/JHW, 2012 WL

280722, at *14 (Bankr. D.N.J. Jan. 30, 2012). Bankruptcy courts exercise this inherent power

pursuant to Section 105(a) of the Bankruptcy Code. *In re Bailey*, 321 B.R. 169, 178 (Bankr. E.D.

Pa. 2005).

Under Section 105(a), bankruptcy courts may "issue any order . . . necessary or

appropriate to carry out the provisions" of Title 11 or take any action or make any

"determination necessary or appropriate to enforce or implement court orders or rules, or to

prevent an abuse of process." 11 U.S.C. § 105(a). This broad power is intended to be exercised to

prevent abuse of bankruptcy procedure.[28] *In re Miller*, 529 B.R. at 85 (citing *In re Volpert*, 110

F.3d 494, 500 (7th Cir.1997)); *In re Coquico, Inc.*, 508 B.R. at 940.

The United States Supreme Court has recognized that courts may assess attorneys' fees

as a sanction pursuant to their inherent power when the party against whom sanctions are to be

imposed has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v.

Nasco, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27, 45 (1991) (*quoting

Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622-23

(1975)). As such, a finding of bad faith or willful misconduct must be explicit to award monetary

---

[28] Under the federal court's inherent power and 11 U.S.C. § 105(a), a court may award sanctions against both attorneys and litigants without regard to the signed document requirement of Rule 9011. *Ettinger & Assocs. LLC v. Miller (In re Miller)*, 529 B.R. 73, 85 (Bankr. E.D. Pa. 2015); *In re Antonelli,* No. 11–20255/JHW, 2012 WL 280722, at *13 (Bankr. D.N.J. Jan. 30, 2012); *In re Bailey*, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005).

sanctions pursuant to a court's inherent power.[29] *In re Miller*, 529 B.R. at 85 (citing *Fellheimer,* 57 F.3d at 1225).

Section 1927 provides, in pertinent part, that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions may only be imposed under Section 1927 if an attorney's conduct is "of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." *LaSalle Nat'l Bank v. First Conn. Holding Grp., L.L.C. XXIII*, 287 F.3d 279, 289 (3d Cir. 2002) (quoting *Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985)).[30] Accordingly, under Section 1927, "[a] court may assess attorney's fees against litigants, counsel, and law firms who willfully abuse the judicial process by conduct tantamount to bad faith." *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991). *See also Xcoal Energy & Res. v. Bluestone Energy Sales Corp.*, No. CV 18-819-LPS, 2021 WL 4319224, at *4–6 (D. Del. Sept. 23, 2021) (bad faith was found under the standards of 28 U.S.C. § 1927, but levied under the court's inherent powers, where defendants asserted meritless fraud and force majeure claims

---

[29] Winterhalter has argued that some courts in Pennsylvania view utilizing Section 105 as something only to be relied upon as a "last resort." *Citizens & N. Bank v. Monroe Heights Dev. Corp. (In re Monroe Heights Dev. Corp.)*, No. 17-10176-TPA, 2017 Bankr. LEXIS 2355, at *14 (Bankr. W.D. Pa. Aug. 22, 2017) (citing *In re Rodgers*, 2011 Bankr. LEXIS 3357, 2011 WL 4101265 *1 (Bankr. W.D. Pa. September 13, 2011)). However, *Citizens*, the case cited by Winterhalter which regards Section 105 as a provision of the Bankruptcy Code to be invoked only as a "last resort," is unrelated to the imposition of sanctions. *Id.* Rather, *Citizens* pertains merely to the court's discussion of its statutory source of authority to dismiss a case where the movant failed to cite any, not whether Section 105 was an appropriate source of power to impose sanctions. *Id.*

[30] Some courts have held that bankruptcy courts lack the authority to impose sanctions under section 1927 of Title 28, holding that Congress intentionally omitted them from the applicability of Title 28 by virtue of their omission from the statutory notes to 28 U.S.C. § 451, which limit the applicability of Title 28 to Article III courts. *See e.g., Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd., Inc.)*, 40 F.3d 1084, 1086 (10th Cir. 1994); *Miller v. Cardinale (In re Deville)*, 280 B.R. 483, 494 (B.A.P. 9th Cir. 2002). However, the Third Circuit has held that "although a bankruptcy court is not a 'court of the United States' within the meaning of § 451, it is a unit of the district court, which is a 'court of the United States,' and thus the bankruptcy court comes within the scope of § 451." *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 105 (3d Cir. 2008). Therefore, this Court is empowered to levy sanctions under Section 1927.

and failed to timely withdraw them). The Third Circuit has held that the principal purpose of

imposing sanctions under Section 1927 is "the deterrence of intentional and unnecessary delay in

the proceedings." *Zuk v. Eastern Pa. Psychiatric Inst.*, 103 F.3d 294, 297 (3d Cir. 1996) (quoting

*Beatrice Foods v. New England Printing*, 899 F.2d 1171, 1177 (Fed. Cir. 1990)).

 To support a court's imposition of sanctions, Section 1927 requires a court to find that an

attorney has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3)

thereby increasing the cost of the proceedings; (4) in bad faith or by intentional misconduct. *In re

Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir. 2008); *In re Prudential Ins. Co. America

Sales Practice Litig.*, 278 F.3d 175, 188 (3d Cir. 2002). Courts have held there is little if any

difference between the type of conduct sanctionable under the Court's inherent power and under

Section 1927, because both require a finding of bad faith. *In re Spectee Group, Inc.*, 185 B.R.

146, 158 (Bankr. S.D.N.Y. 1995). However, unlike courts' inherent power, the element of

willfulness under Section 1927 need not be explicit, but rather can be established implicitly

under the circumstances. *Baker Industries v. Cerberus*, 764 F.2d 204, 209 (3d Cir. 2000).

 Under these elements, when an initial bankruptcy petition unreasonably extends litigation

that is pending in another forum, a court may sanction such conduct under Section 1927. *In re

Antonelli,* 2012 WL 280722, at *16 ("The debtor and her husband had previously sought to

protect their interest in the Property in state court and through the husband's bankruptcy filing.

By initiating an unsustainable and bad-faith bankruptcy, and by following up with meritless

pleadings, the debtor's attorney had no basis to believe that the debtor could reorganize in a

Chapter 13 case.").

i.    **Sanctions Against Winterhalter are Appropriate Under Section 105(a), the Court's Inherent Powers, and Section 1927 for Bad Faith Conduct and Unnecessarily Multiplying Proceedings.**

Winterhalter willfully filed the Petition and Bid Procedures Motion on behalf of DVLT in bad faith. Doing so, particularly in the obvious absence of corporate authority for the Petition, constitutes an abuse of the bankruptcy system, because both the Petition and Bid Procedures Motion were filed to advance the illegitimate goals of short-circuiting the District Court Litigation, in an effort to gain an advantage therein, and pursue an expedited sale process that lacked any factual support for the immediacy of such sale and was clearly intended to deprive Jim of the full value of his 50% share in the company and reserve a substantial portion of the sale proceeds for Jack personally. Such conduct warrants sanctions for bad faith and willful misconduct under 11. U.S.C. § 105(a).

Furthermore, with respect to 28 U.S.C. § 1927, Winterhalter abused the judicial process and unnecessarily multiplied proceedings in an unreasonable and vexatious manner, by entirely disrupting[31] the District Court Litigation with a meritless bankruptcy Petition, by pursuing the Bid Procedures Motion on the cusp of Thanksgiving in an effort to force through an unfair sale of the company, and by defending the Dismissal Motion—thereby increasing the cost of the proceedings with respect to both the bankruptcy case and the District Court Litigation, and causing significant delays to any resolutions of the same.

Specifically, the filing of the bad faith Petition itself unreasonably extended litigation in the District Court for thirty-eight days while the bankruptcy case was pending and caused the outright dismissal of the pending summary judgment motions. Furthermore, the bankruptcy case

---

[31] Despite the limitations of the automatic stay on certain defendants in the District Court Litigation, the District Court suspended all proceedings on November 18, 2020, and as noted in the Oral Opinion, the Court believes this may have been the intention all along. Tr. of Oral Op., ECF 102 at 11:18-21. *See supra* Section II (suggestion of bankruptcy in the District Court resulted in the suspension of the entire case and dismissal of the cross-motions for summary judgment).

itself was unnecessarily protracted when Winterhalter failed to heed the Court's clear warning on
November 24, 2020, at the Bid Procedures Hearing, and proceeded to defend the Dismissal
Motion despite the absence of any support for his position that the filing had been authorized.

Ultimately, by filing the Petition, in order to pursue the Bid Procedures Motion on an
expedited basis, which could only be seen as being designed to chill the potential for competitive
bidding, undervalue DVLT, and reserve for Jack a substantial portion of the sale proceeds—all
while totally avoiding Jim's potential claims in the District Court Litigation—Winterhalter
created an untenable situation where Jim was forced to rapidly engage bankruptcy counsel to
protect his interests in another forum while simultaneously being delayed on multiple fronts.[32]
As a result, Jim incurred unavoidable additional legal fees he would not have otherwise incurred
absent the bad faith Petition and vexatious pursuit of the Bid Procedures Motion. Specifically,
the expedited timeline of the Bid Procedures Motion foreclosed any possibility of KPC
mitigating costs and fees by limiting the involvement of SPG in preparation for pursuing its
opposition to the Bid Procedures Motion. The only way for KPC to obtain the necessary
evidentiary support for its opposition to the Bid Procedures Motion ahead of the November 24,
2020 hearing was to enlist the immediate direct assistance of SPG.[33] Jim's costs were only
further increased by Winterhalter's insistence on defending against the Dismissal Motion even in
the absence of any objective evidentiary support for his position that the Petition had been

---

[32] While the Court believes the delays caused in both the bankruptcy and District Court cases are self-evident, to
make matters clearer it will note that the delays were twofold; the first delay was caused with respect to the District
Court Litigation by the filing of the Petition in bad faith and pursuit of the Bid Procedures Motion on an expedited
basis, the timing and speed of which was an obvious effort to dodge any potential liability in the District Court
Litigation; the second delay was in the bankruptcy case and caused by Winterhalter's failure to heed the Court's
clear warning at the Bid Procedures Hearing and seek dismissal because there was no valid vote taken to authorize
the filing of the Petition.
[33] The Court is cognizant that the time records of KPC and SPG reflect that the two firms worked closely with
respect to all aspects of the case (drafting and prosecution of the Dismissal Motion, opposition to the Bid Procedures
Motion, review of schedules, review of the application to employ Debtor's counsel, preparation and review of
various declarations and other evidentiary information, etc.). The reasonableness of such fees is addressed in Part D.

authorized, as costs would have been significantly mitigated had the parties been able to avoid the two-day December Hearing that required extensive testimony from multiple witnesses.

As discussed *supra,* with respect to the filing of the Petition, Winterhalter personally arranged the Global Settlement Meeting, and then took the meritless position that a valid vote, authorizing a bankruptcy petition on behalf of DVLT, had apparently occurred at some point after that meeting concluded. All credible testimony at the December Hearing indicated that no authorization was given to file the Petition. Nevertheless, he forged ahead with the filing anyway to advance an improper legal strategy, the clear motive of which was to use the bankruptcy system to circumvent the District Court Litigation and pursue an arm-in-arm sale of a solvent company, thereby availing himself to the considerable leverage of an 11 U.S.C. § 363 sale and securing for Jack a specially negotiated payment of $750,000.00, which intentionally diminished the sale proceeds available to Jim. Based on the foregoing, the Court considers Winterhalter's pursuit of the bankruptcy, Bid Procedures Motion, and opposition to the Dismissal Motion to constitute egregious misconduct undertaken in bad faith which served to unreasonably and vexatiously multiply proceedings involving the Brothers and DVLT, thereby warranting sanctions under Section 1927, as well as Section 105(a) as discussed *supra,* in the form of attorney's fees and costs caused by the filing of the Petition, pursuit of the Bid Procedures Motion, and opposition to the Dismissal Motion.

> ### ii.  Sanctions Against Jack Are Not Warranted Under 11 U.S.C. § 105 or the Court's Inherent Powers.

While Section 105(a) and the Court's inherent power permit an award of sanctions against both counsel *and* litigants, such as a debtor's representative like Jack, on account of bad faith litigation conduct, in this case, the Court has no basis to conclude that he pursued bankruptcy in bad faith rather than pursuant to his counsel's advice respecting how to utilize the

legal system to achieve his goals. *See In re Miller,* 529 B.R. at 85; *In re Antonelli,* 2012 WL 280722, at \*13; *In re Collins,* 250 B.R. 645, 658 (Bankr. N.D. Ill. 2000). As mentioned *supra,* to impose sanctions under Section 105(a) and its inherent power, the Court must make an *explicit* finding that the sanctioned party abused the judicial system *in bad faith.* Certainly, Jack had goals with respect to the business, its dissolution or sale, and the District Court Litigation. While using the bankruptcy system to advance those goals was inappropriate, the Court lacks the record needed to make an *explicit* finding that Jack, merely a layperson, even remotely recognized that Winterhalter's legal strategies in this bankruptcy were abusive to the judicial system at all or appreciated the gravity of using the bankruptcy system in this manner. Furthermore, with respect to Jack's testimony at the December Hearing, as discussed in connection with Rule 9011, no evidence was offered at the Sanctions Hearing demonstrating that Jack testified purposely *in bad faith* that a vote had taken place and a shareholders/directors meeting had occurred, rather than based upon a misunderstanding as a layperson. Therefore, the Court lacks a basis upon which to sanction Jack personally under Section 105(a) or the Court's inherent power.

**C.    Reasonable Sanctions Under Rule 9011, the Court's Inherent Powers, Section 105(a), and Section 1927**

Having concluded that sanctions against Winterhalter are appropriate under Rule 9011, 11 U.S.C. § 105(a), and 28 U.S.C. § 1927, the Court will now determine what is a reasonable sanction under these circumstances.

**i.    Reasonableness under Rule 9011**

A sanction under Rule 9011 must be "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr. P. 9011(c)(2). "[Such] sanction[s] may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an

order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." *Id.* The purpose of sanctions under Rule 9011 is to deter baseless filings. *Schaefer,* 542 F.3d at 99; *In re Jazz Photo Corp.*, 312 B.R. at 531. In that regard, "[w]hile compensation to a victim may be a by-product of sanctions, the primary purpose is deterrence. Rule 9011(c)(2) is not purposed as a fee-shifting provision." *Schwab Ind., Inc. v. Huntington Nat'l Bank (In re Sii Liquidation Co.)*, Nos. 10-60702, 14-6024, 2018 Bankr. LEXIS 692, at *4 (Bankr. N.D. Ohio March 12, 2018). That said, while sanctions under Rule 9011 are not meant to reward the wronged party but rather, to accomplish specific and general deterrence, monetary sanctions in the form of an order to pay all or part of an injured party's counsel fees and expenses can be an acceptable means by which to accomplish those goals.[34] *In re Coquico, Inc.*, 508 B.R. at 948.

In assessing the appropriate sanction under Rule 9011, courts should consider mitigating factors such as, *inter alia,* the sanctioned party's ability to pay, the degree of bad faith or want of diligence, the amount of fees and costs resulting from the attorney's (or party's) inappropriate conduct, mitigating conduct, if any, the amount necessary and effective to bring about deterrence, and/or whether the sanctioned party has been subject to adverse press scrutiny by the sanction. *Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 195–96 (3d Cir. 1988); *In re Sii Liquidation Co.*, 2018 Bankr. LEXIS 692, at *18.

Moreover, "[w]here a district court decides to award a monetary sanction, such as attorney's fees, the total amount of such a sanction (as well as the initial decision whether to

---

[34] "Other sanctions that could be appropriate in some circumstances, and that may take the place of a monetary award, include publication, an order barring an attorney from appearing for a period of time, reprimand, dismissal of baseless claims or defenses, or even ordering 'the attorney who violated the rule to circulate in [his or her] firm a copy of the opinion in which the pleadings were criticized.'" *Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir. 1988).

impose such a sanction) should be guided by equitable considerations." *Doering,* 857 F.2d at 195

(citing *Faraci v. Hickey-Freeman Company, Inc.*, 607 F.2d 1025, 1028 (2d Cir. 1979)).

> **ii.    Reasonableness Under 28 U.S.C. § 1927, the Court's Inherent Powers, And Section 105(a).**

With respect to Section 105(a) and the court's inherent power, "[t]he Supreme Court

recognized that a bankruptcy court's inherent authority to sanction includes an

'order…instructing a party that has acted in bad faith to reimburse legal fees and costs incurred

by the other side.'" *In re Crystal Cathedral Ministries*, Case No. 2:12-bk-15665-RK, 2020 WL

1649619, at *56 (Bankr. C.D. Cal. March 31, 2020) (quoting *Goodyear Tire & Rubber Co. v.*

*Haeger*, --US--, 137 S. Ct. 1178, 1186, 197 L.Ed.2d 585 (2017)). However, such an order must

be compensatory, not punitive, requiring the court to "establish a causal link – between the

litigant's misbehavior and legal fees paid by the opposing party." *Id.* Any award of attorneys'

fees pursuant to the court's inherent authority may only include fees the complaining party

would not have paid but for the misconduct. *Id.* Thus, under Section 105(a), courts may impose

remedial sanctions aimed at compensating an aggrieved party for damage caused by the

misconduct, including reimbursement for legal fees and expenses incurred. *Crawford v.*

*Margabandhu (In re Maya Restaurants, Inc.)*, 585 B.R. 761, 776 (Bankr. W.D. Pa. 2018).

Like Rule 9011, Section 1927 requires the Court to employ equitable considerations

when crafting an appropriate sanction and affords the court broad discretion to ensure that the

remedy chosen serves the interests of justice. *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir.

1986) (citing *Perichak v. Int'l Union of Elec. Radio & Mach. Workers, Local 601*, 715 F.2d 78,

80 (3d Cir. 1983)). In this regard, the court should endeavor to impose the least severe sanction

in furtherance of such purpose. *In re Miller*, 529 B.R. at 96 (apportioning a specific portion of

the monetary sanction under Section 1927 after balancing equities to determine appropriate

sanction amount); *Loftus v. SEPTA*, 8 F.Supp.2d 458, 463–64 (E.D. Pa.1998) (upon balancing

the equities, only a portion of the full fees incurred were imposed as a fee-shifting sanction under

Section 1927).

When issuing a fee-shifting award as a sanction under Rule 9011, a court's inherent

power, or Section 1927, the Court must calibrate the award to include only the damages that bear

a causal link to the misconduct in question, in order to remain in the realm of the compensatory

and prevent the sanction from becoming punitive in nature. *Goodyear Tire & Rubber Co. v.*

*Haeger*, --U.S.--, 137 S. Ct. 1178, 1186 n.5, 197 L. Ed. 2d 585 (2017) (provisions that enable

fee-shifting under Federal Rule of Civil Procedure 11 and Section 1927 "confirm the need to

establish a causal link between misconduct and fees when acting under inherent authority, given

that such undelegated powers should be exercised with especial 'restraint and discretion.'")

(quoting *Roadway Express, Inc. v. Piper*, 447 U. S. 752, 764, 100 S. Ct. 2455, 65 L. Ed. 2d 488

(1980)). The Court is therefore not prohibited from imposing fee-shifting sanctions to cover

some or all of the reasonable attorney's fees and costs directly incurred as a result of bad faith

conduct under Rule 9011, its inherent authority, or Section 1927, but in doing so it must strictly

limit the award to only those fees that were directly caused by the conduct in question.

> **D.    An Award in the Amount of the Total Reasonable Fees and Costs Which Jim**
> **Would Not Have Incurred But For Winterhalter's Misconduct in Pursuing**
> **the Bad Faith Petition Necessitating Seeking Dismissal Is An Appropriate**
> **Sanction Under the Circumstances.**

Winterhalter maintains a firm opposition to the use of fee-shifting as the mechanism for

sanctions. Winterhalter's Fee Br., ECF 180 at 3. Winterhalter is correct in his contention that

monetary sanctions are not the sole means of sanction available under any of the authorities

discussed above. Furthermore, while the damage to his reputation and loss of goodwill with his

client should in theory constitute at least a modicum of deterrence from him engaging in the

same or similar conduct in the future, at least with respect to DVLT, the Court is not convinced that these factors, without more, will adequately deter similar future conduct with future clients.[35]

As discussed *supra,* the totality of the circumstances shows that Winterhalter's conduct amounted to a clear affront to the judicial process. Winterhalter's total disregard for the Court's explicit warning with respect to ensuring corporate authority had been obtained, coupled with the insidious intent behind the Petition to divest Jim of the fair value of his interest in DVLT easily meets the heavy burden to support a sanction of fee-shifting for all the unnecessary legal work and associated costs that directly flowed from his bad faith conduct.

Jim has submitted time records for KPC and SPG with respect to the work performed by both firms in connection with, *inter alia,*[36] Jim's opposition to the Bid Procedures Motion and the prosecution of the Dismissal Motion. Jim's Fee Br., ECF 177 at 3, 10-11. Jim contends that the full amount of his fees and costs owed to both firms was incurred directly as a result of the Petition and should be imposed as an appropriate deterrent to future conduct by Winterhalter, and those similarly situated. *Id.* at 5, 7, 9, 10. In contrast, Offit Kurman and Winterhalter suggest that, if the Court must impose a monetary sanction, the disgorgement of the $37,393.00 in total

---

[35] The risk of damaging one's reputation is ever present in legal practice and was so at the time Winterhalter advanced the Petition. As noted above, Winterhalter still made the unreasonable determination that the best course of action was to file a meritless petition, in order to take a solvent company to bankruptcy court and push for an expedited sale that clearly reserved a significant portion of the sale price for an insider—all the while knowing that the two shareholders were embroiled in a contentious dispute over the management of the corporation and the proposed distributions of the equity therein. Any objectively reasonable bankruptcy attorney would have understood that a petition for a solvent debtor with no meaningful debt aside from the expenses associated with a two-party dispute that it was paying on behalf of one of its 50% shareholders, against a fellow 50% shareholder, raises serious questions about the good faith requirements of 11 U.S.C. § 1112(b). The risk of such an outrageous course of action to Winterhalter's reputation was not a sufficient deterrent then and, at best, is only minimally more impactful as a deterrent now. In accordance with the above, the Court does not assign much weight to Winterhalter's arguments in favor of a non-monetary sanction because, Winterhalter's concern for his reputation and relationship with his client did not deter him from pursuing the Petition for a clearly improper purpose.

[36] Jim also prosecuted a motion for relief from stay, that was rendered moot as a result of the granting of the Dismissal Motion, and opposed DVLT's motion to reconsider the Court's Order consolidating the Sanctions Motions.

fees collected from DVLT in this case, payable to whomever the Court directs, would be an adequate "deterrent to Counsel taking future aggressive action to assist clients before any tribunal." Winterhalter Fee Br., ECF 180 at 13.

However, by framing a disgorgement of fees as a deterrent for taking "aggressive action to assist a client," Winterhalter appears to refuse to acknowledge the wrongfulness of his actions, implying that his conduct in fact does not warrant sanctions under Rule 9011, the Court's inherent power, and 28 U.S.C. § 1927, because it was merely in service of the "aggressive" pursuit of a valid purpose. *Id.* Such a position is concerning to the Court given the multiple opportunities that Winterhalter had to avoid this situation. In fact, Jim has consistently argued from the outset of the case that the Debtor lacked corporate authority to file a bankruptcy petition. Given that this issue was raised so early in the case and in light of the Court's cautionary warning that Winterhalter should not oppose a dismissal of the case unless he had hard evidence that proved the Debtor had corporate authority to file a bankruptcy case, it is astounding that Winterhalter continues to argue that he was only aggressively pursuing a valid bankruptcy purpose and it suggests to the Court that a more significant sanction is necessary, to prevent similar conduct in the future, given Winterhalter's apparent belief that his actions in this case were entirely justified.[37]

Under the specific circumstances of this case, the Court believes that the only appropriate sanction for Winterhalter's misconduct is to award all reasonable legal fees and costs incurred by Jim as a direct result of the bad faith filing, as Section 105(a) permits. All of the fees and costs

---

[37] The Court reiterates that it unambiguously attempted to avoid this outcome by cautioning Winterhalter at the earliest stage of this case to make certain that the corporate authority was present and that the Petition was presented for a valid bankruptcy purpose. At the Bid Procedures Hearing, the Court specifically forewarned Winterhalter of the need to provide evidence that showed the manifestation of shareholder consent in the event that the Debtor was solvent and indicated its expectation that Winterhalter would investigate Jim's claims that the proper authorization had not been obtained, and its expectation of dismissal if it indeed had not. Bid Proc. Hrg., ECF 74 at 19:19–20:14.

incurred by Jim during the pendency of this bankruptcy are the direct result of the bad faith filing orchestrated by Winterhalter, accordingly, they are all compensable under Section 105(a), so long as reasonable.

While the Court primarily bases its award on Section 105(a) and its inherent powers, an award of all fees and costs incurred by Jim in this bankruptcy is also equally compensable under Rule 9011 (aside from those incurred in connection with the Bid Procedures Motion due to the twenty-one-day safe harbor rule) and Section 1927. As discussed *supra*, when issuing a fee shifting award under Section 105(a), Rule 9011, or Section 1927, the Court must calibrate the award to include only those damages bearing a causal link to the misconduct to remain compensatory, which is precisely what this Court is doing in awarding reasonable fees and costs which would not have been incurred by Jim absent the bankruptcy filing. Having already considered the mitigating factors raised by Winterhalter, the Court has concluded these would not serve as sufficient deterrents in the absence of an award compensating Jim for the reasonable fees and costs incurred in the case, and therefore, the award is equally justified under Rule 9011 and Section 1927.

The Court will now assess what fees and costs sought by Jim in connection with this bankruptcy are reasonable.

> **i.    The Hours and Fees of KPC Are Reasonable, But the Hours and Fees of SPG Are Excessive And Should Be Adjusted.**

Winterhalter admits that KPC has extensive experience in bankruptcy law, employs competent practitioners, and the rates and work reflected in its time records are reasonable. While no objections to the rate or hours provided in the KPC time records were made, Winterhalter has challenged the rates and hours submitted by SPG as being unreasonable.

Courts in this district apply the lodestar method to calculate a reasonable fee award under the circumstances of the case. *Cmty. Ass'n Underwriters of Am. v. Queensboro Flooring Corp.*, No. 3:10-CV-1559, 2016 U.S. Dist. LEXIS 187125, at *5-6 (M.D. Pa. Mar. 18, 2016) ("[T]he starting point for determining the reasonableness of attorney's fees is the lodestar calculation…"). *See In re Diloreto*, 388 B.R. 637, 652 (Bankr. E.D. Pa. 2008). The lodestar calculation is performed by (1) identifying the reasonable rate for the type of work performed by beginning with the attorney's usual billing rate in comparison with the prevailing market rates in the relevant community, and (2) multiplying the reasonable rate by the number of hours reasonably expended. *Pa. Env't. Def. Found. v. Canon-Mcmillan Sch. Dist.*, 152 F.3d 228, 231–32 (3d Cir. 1998).

The market rate to be used for this calculation is the prevailing rate based generally on the geographical area, the nature of the services, and the experience of the attorneys. *In re Premier Food Sys.*, No. 08-14897/JHW, 2008 Bankr. LEXIS 4035, at *10 (Bankr. D.N.J. Dec. 17, 2008) (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005)). To establish the market rate, the prevailing party must offer evidence that the attorney's usual market rate is in line with the market rate in the community. *Id.* (citing *In re Datatec Systems, Inc., Sec. Litig.*, No. 04-CV-525, 2007 U.S. Dist. LEXIS 87428, 2007 WL 4225828, *9 (D. N.J. Nov. 28, 2007)). Additionally, "a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession," will inform any analysis. *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 854 (3d Cir. 1994).

Under this standard, the applicable geographical area is the Eastern District of Pennsylvania and the services provided include the protection of Jim's interests in bankruptcy proceedings, and opposition to, *inter alia*, the Petition and the Bid Procedures Motion. No

evidence aside from each attorney's standard billing rate has been introduced establishing a specific market rate, or range of rates. Therefore, the Court relies on its expertise in reviewing fee applications and its expert judgment regarding what it considers to be a reasonable rate in this forum and exercises its discretion to make that determination in the absence of evidence of the same from any of the parties. *See L.J. v. Audubon Board of Educ.,* 373 Fed. App'x. 294, 297 (3d Cir. 2010). Winterhalter concedes, and the Court in its judgment agrees, that the rates of KPC are reasonable compared to the prevailing market rates in the community. Winterhalter Fee Br., ECF 180 at 3. For services rendered in this bankruptcy case, KPC charged $530 per hour for services performed by Mr. Aris Karalis, a bankruptcy attorney with over thirty years of experience, $395 per hour for services performed by Mr. Robert Seitzer, a bankruptcy attorney with over twenty years of experience, and $130 per hour for paralegal work performed by Ms. Jill Hysley. Ex. A & B, Jim's Fee Br., ECF 177-1, 177-2. Based on this Court's experience and knowledge of the common rates that bankruptcy practitioners charge in this district, the rates of KPC are indeed comparable to those of other bankruptcy practitioners in the Eastern District of Pennsylvania with similar levels of experience and, therefore, reasonable for the purpose of the lodestar calculation.

With respect to the number of hours reasonably expended on a matter, "[h]ours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). KPC has submitted records reflecting 365.5 hours of work, from November 11, 2020, through and including September 21, 2021. Ex. A, Jim's Fee Br., ECF 177-1 at 3–4; Ex. B, *id.*, ECF 177-2 at 3. Winterhalter has not raised any objection with respect to the number of hours submitted by KPC, and upon reviewing the total time and the details of the services performed, the Court finds they are reasonable for the type of

work performed, particularly given the circumstances of this case, which required Jim to develop

an extensive factual record to support the Dismissal Motion and assist the Court with

understanding the complex District Court Litigation which had been pending for two years as of

the Petition Date.

For services rendered during this bankruptcy case, KPC charged, $530 per hour for 211.4

hours of services performed by Mr. Aris Karalis, $395 per hour for 136.6 hours of services

performed by Mr. Robert Seitzer, and $130 per hour for 17.5 hours of paralegal work performed

by Ms. Jill Hysley, for a total of 365.5 hours and total fees of $168,274.00, plus total costs

incurred of $5,666.87. *See* Ex. A, *id.*, ECF 177-1; Ex. B, *id.*, ECF 177-2. It is the Court's

determination that the foregoing constitutes a reasonable number of hours for the work

performed by KPC at reasonable rates. Accordingly, for services rendered in the bankruptcy

case, the lodestar calculation for KPC yields a total of $173,940.87 in fees and costs.

With respect to SPG, Winterhalter has challenged the reasonableness of both the work

performed, and the rates charged, by SPG in this case. Winterhalter Fee Br., ECF 180 at 4.

Specifically, Winterhalter questions whether SPG's involvement in the bankruptcy case was

necessary at all and argues that the rates charged by them "greatly exceed those of bankruptcy

counsel." *Id.*

SPG was retained prior to the bankruptcy case to represent Jim at least with respect to the

District Court Litigation. Jim submits that SPG was also retained to provide services in

connection with the bankruptcy case. Ex. C, Jim's Fee Br., ECF 177-3 at 3 ¶ 4. SPG entered no

appearances on behalf of Jim in this bankruptcy case until the Sanctions Hearing—where Mr.

Green and Mr. Keller both entered appearances on behalf of Jim—and filed no documents on the

docket. Sanctions Hrg. Tr., ECF 170 at 8:2–4. However, SPG submits time records reflecting

over 100 hours of services billed in connection to this case. *See* Ex. C, Jim's Fee Br., ECF 177-3.

Upon review of the SPG time records, it is clear that at least some of the work performed by

SPG, which all occurred between November 11, 2020 and December 17, 2020, would not have

been incurred, but for the filing of the Petition in bad faith. *See id.* Surely, if the bankruptcy had

not been filed, there would have been no reason for SPG to collaborate with KPC in connection

with the work performed to oppose the expedited Bid Procedures Motion, to review the

bankruptcy schedules and other filings, or to prosecute the Dismissal Motion, which all involved

the drafting and review of numerous factual declarations in support of all the filings by Jim over

the life of the bankruptcy case.

Specifically, the SPG time records indicate 100.9 total hours, seemingly spent working

closely with KPC to research and formulate the legal reasoning and compile the evidentiary

support for prosecuting the Dismissal Motion and resisting the Bid Procedures Motion. *See id.*;

Mot. to Dismiss, ECF 50. A comparison of the seventeen documents and 400+ pages of

information enclosed in the Dismissal Motion with the SPG time records directly reflects the

extensive work SPG performed which was necessary to accurately describe the series of events

that gave rise to the Petition and to support Jim's opposition to the Petition. *See generally* Ex. C,

Jim's Fee Br., ECF 177-3; Mot. to Dismiss, ECF 50.

That said, it is equally apparent that the SPG time records include some excessive billing.

For example, Mr. Keller, recorded 5 hours on December 16th, and 3.5 hours on December 17th,

to attend the December Hearing, where he did not participate at all. Ex. C, Jim's Fee Br., ECF

177-3 at 11. Generally, to award attorneys' fees for court appearances, all professionals attending

a hearing must have had a role. *See In re Jefsaba Inc.,* 172 B.R. 786, 800–01 (Bankr. E.D. Pa.

1994). A presence as a mere spectator is not compensable. *In re Johnson & Johnson Deriv.*

*Litig.,* No. 10-2033(FLW), 2013 WL 11228425, at \*25 (D. N.J. June 13, 2013). Unless the magnitude of a case demands it, the attendance of additional counsel representing the same interests as counsel actually conducting the litigation is wasteful and should not be included in a request for counsel fees. *Id.* SPG has not demonstrated a specific role that Mr. Keller had during his attendance at the December Hearing and, accordingly, the time billed for his attendance at that hearing must be deducted.

With respect to the reasonableness of SPG's rates, aside from SPG counsel's standard billing rates, neither party has presented any evidence with respect to the comparable market rates in the community. Accordingly, as with KPC, the Court exercises its discretion to make that determination. The Court finds the rates charged by SPG to be above those commonly charged in this district for bankruptcy counsel. Mr. Green and his partner, Mr. Keller, the attorneys listed in the SPG time records, have somewhat comparable levels of experience to that of Mr. Karalis, albeit not in bankruptcy. *See generally* Ex. A, Jim's Fee Br., ECF 177-1 at 2–3; Ex. C, *id.*, ECF 177-3 at 3. Messrs. Green and Keller, respectively, have been licensed to practice law in Pennsylvania sixteen and ten years more than Mr. Karalis and, respectively, charge $1,150 and $775 per hour for representation. Ex. C, *id.*, ECF 177-3 at 3. However, no evidence was submitted reflecting that either Mr. Green or Mr. Keller specializes in bankruptcy law. Notwithstanding the fact that SPG does not seem to specialize in bankruptcy law, the issues in this case are related to general business litigation, and because of the close correlation between the District Court Litigation and the bankruptcy case, it was reasonable for SPG to work closely with KPC on the issues presented in the bankruptcy case. That said, their rates must reflect the supporting role they played to KPC in this case.

In this Court's expert opinion, the market rate in this district for practitioners who do not specialize in bankruptcy law, like Mr. Green and Mr. Keller, would ordinarily never be above, or even equal to, that of Mr. Karalis. As such, the Court finds it appropriate to reduce the rates of both Mr. Keller and Mr. Green to $500 per hour, which the Court finds to be consistent with the market rate in this district for seasoned business law practitioners serving in a supportive role in a bankruptcy case of this type.

In further determining the appropriate number of hours reasonably expended by SPG for services in the bankruptcy case, it is necessary to consider the role that SPG played in this case. Based upon the Court's review of SPG's timesheets and in light of its experience and expertise, the Court finds that SPG served in primarily a supportive role in the bankruptcy case, to assist KPC in opposing the Bid Procedures Motion and prosecuting the Dismissal Motion by helping KPC understand the circumstances underlying the then two-year-old District Court Litigation. As such, the Court, in its discretion, considers 80 hours a reasonable amount of time for the work SPG performed, to assist KPC with protecting Jim's interests in the bankruptcy case. Accordingly, for services rendered in support of the bankruptcy case, SPG shall be deemed to have charged $500 per hour for a total of 80 hours of legal services, yielding a lodestar calculation of $40,000.00 in total fees. It is the Court's determination that this constitutes a reasonable number of hours at a reasonable rate and does not compensate Mr. Keller for his nonparticipation at the December Hearing.

### ii.    Reasonable Sanctions Award Against Offit Kurman

Because Offit Kurman is jointly and severally liable with Winterhalter only pursuant to Rule 9011(c)(1)(A), the Court must ensure that the twenty-one-day safe harbor provision contemplated under Rule 9011 is observed with respect to fees and costs incurred opposing the

Bid Procedures Motion.[38] Accordingly, the Court will apportion $9,757.30 from the total award of $213,940.87 to Winterhalter personally. Of the amount apportioned, $914.30 is attributable to costs and $8,843.00 is attributable to fees incurred in connection with objecting to the Bid Procedures Motion.[39] Therefore, Offit Kurman is jointly and severally liable with Winterhalter for $204,183.57.

## IV.    CONCLUSION

For the reasons discussed above, Winterhalter is liable under Section 105(a) and the Court's inherent power for sanctions in the amount $213,940.87. Offit Kurman is jointly and severally liable with Winterhalter for $204,183.57 of that amount based upon Winterhalter's violation of Rule 9011. This is an appropriate sanction under the circumstances and will serve as an adequate deterrent for Winterhalter and others similarly situated. An appropriate Order will follow.

Honorable Ashely M. Chan
United States Bankruptcy Judge

Date: May 25, 2022

---

[38] As mentioned *supra,* an award of all fees and costs incurred by Jim in this bankruptcy is compensable under Rule 9011, aside from those incurred in connection with the Bid Procedures Motion due to the twenty-one-day safe harbor rule. Accordingly, the Court has identified those fees and costs which appear to have been incurred solely in furtherance of opposing the Bid Procedures Motion and apportioned those fees to Winterhalter individually under Section 105(a).

[39] The Court has identified these amounts based upon a review of the time records and itemized costs of KPC, and time records of SPG, for the period of time when the Bid Procedures Motion was pending.